CA No. 09-70020

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

<table>
<tr><td>JULIUS OMAR ROBINSON,</td><td>)</td><td>DC Nos.:<br>Civil No. 4:05-CV-756-Y<br>Criminal No. 4:00-CR-00260-2</td></tr>
<tr><td style="text-align:center">Defendant-Petitioner,</td><td>)<br>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td>UNITED STATES OF AMERICA,</td><td>)<br>)</td><td>**DEATH PENALTY**</td></tr>
<tr><td style="text-align:center">Plaintiff-Respondent.</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
</table>

## APPLICATION FOR A CERTIFICATE OF APPEALABILITY

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE TERRY MEANS
United States District Judge

SEAN K. KENNEDY
E-Mail: Sean_Kennedy@fd.org
Federal Public Defender
CRAIG HARBAUGH
E-Mail: Craig_Harbaugh@fd.org
Federal Public Defender
321 East 2nd Street
Los Angeles, California
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

MICHAEL CHARLTON
Deputy Federal Public Defender
E-Mail: mike_charlton@fd.org
Federal Public Defender's Office
411 East Bonneville Avenue, Ste 250
Las Vegas, NV 89101-6632
Telephone: (702) 388-6577
Facsimile: (702) 388-6261

Attorneys for Defendant-Petitioner
JULIUS OMAR ROBINSON

**TABLE OF CONTENTS**

PAGE

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.  Penalty-Phase Preparation:  Trial Counsel Failed to Conduct a
    Reasonable Investigation in Order to Spare Robinson's Life . . . . . . . . . . . 3

II.  Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.  Prosecution's Evidence Supporting Future Dangerousness . . . . . . . 7

        1.  Unrebutted Allegation that Robinson Ordered a
            "Hit" of Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        2.  Unrebutted Allegation that Robinson Was a Member
            of a Violent Gang . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        3.  Unrebutted Allegation that Robinson Attempted
            to Murder Tucker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.  Defense's Presentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.  Habeas Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.  Rebuttal Evidence to Prosecution's Case in Aggravation . . . . . . . . 15

        1.  The Prosecution's Allegation That  Robinson
            Ordered a "Hit" Was False . . . . . . . . . . . . . . . . . . . . . . . 15

        2.  Robinson's Alleged Involvement with a Notorious
            Street Gang Was Nothing More Than a Group of
            Adolescent Hoodlums . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        3.  Robinson Shot Into a Parked Truck Without
            Knowledge That Tucker Was Inside . . . . . . . . . . . . . . . . . . 18

    B.  Reasonably Available Mitigation Evidence . . . . . . . . . . . . . . . . . 20

        1.  Robinson Suffered a Chaotic Infancy and Was Raised
            by Violent, Drug-Addicted and Drug-Dealing Parents . . . . . 20

        2.  Robinson Spent the Remainder of His Childhood
            Neglected by Disabled and Disinterested
            Grandparents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF CONTENTS

**PAGE**

      3.    Robinson Struggled Throughout His Adolescence and Early Adulthood To Help his Drug-Addicted, Emotionally Absent Mother ........................... 27

      4.    Robinson Suffered Cognitive Impairments as a Result of His Chronic Exposure to Alcohol in *Utero* and Pesticides in Childhood ........................... 29

   C.   Government's Opposition ............................... 34

   D.   District Court Denial ................................. 34

LEGAL STANDARD ........................................ 37

ARGUMENT .............................................. 38

I.   Reasonable Jurists Would Certainly Debate, If Not Disagree With the District Court's Summary Denial of Robinson's Ineffective Assistance of Counsel Claims ............. 38

II.   The District Court's Refusal to Grant an Evidentiary Hearing Warrants Automatic Reversal ........................... 45

CONCLUSION ........................................... 49

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                    **PAGE(S)**

*Adams v. Quarterman,*
    324 Fed. Appx. 340 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Anderson v. Johnson,*
    338 F.3d 382 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Avila v. Quarterman,*
    560 F.3d 299 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Blanton v. Quarterman,*
    287 Fed. Appx. 407 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Brown v Sternes,*
    304 F.3d 671 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Dawson v. Delaware,*
    503 U.S. 159 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Epps v. Thaler,*
    No. 08-70050, 2009 U.S. App. LEXIS 20098 (5th Cir. Sept. 9, 2009)  37, 38

*Friedman v. United States,*
    588 F.2d 1010 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Gray v Branker,*
    529 F.3d 220 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Jackson v. Dretke,*
    450 F.3d 614 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Lewis v. Dretke,*
    355 F.3d 364 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*Machibroda v. United States,*
    368 U.S. 487 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Matthews v. United States,*
    533 F.2d 900 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Miller-El v. Cockrell,*
    537 U.S. 322 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Nelson v. Quarterman,*
    472 F.3d 287 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                  **PAGE(S)**

*Nelson v. United States,*
    297 Fed. Appx. 563 (8th Cir. Oct. 27, 2008) . . . . . . . . . . . . . . . . . . . . . . . 49

*Osagiede v. United States,*
    543 F.3d 399 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Outten v Kearney,*
    464 F.3d 401 (3rd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Pike v. United States,*
    409 F.2d 499 (5th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Pippin v. Dretke,*
    434 F.3d 782 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Rompilla v. Beard,*
    545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Skinner v. Quarterman,*
    528 F.3d 336 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Smith v. Dretke,*
    422 F.3d 269 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Sonnier v. Quarterman,*
    476 F.3d 349 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Strickland v. Washington,*
    466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39, 40

*Tennard v. Dretke,*
    542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Tucker v. United States,*
    275 Fed. Appx. 402 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . 46

*United States v. Bartholomew,*
    974 F.2d 39 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Beltran,*
    278 Fed. Appx. 433, 435 (5th Cir. 2008) . . . . . . . . . . . . . . . . . 49

*United States v. Briggs,*
    939 F.2d 222 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 46

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                   **PAGE(S)**

*United States v. Cavitt,*
    550 F.3d 430 (5th Cir. 2008) .................................. 46

*United States v. Culverhouse,*
    507 F.3d 888 (5th Cir. 2007) .................................. 47

*United States v. Drones,*
    218 F.3d 496 (5th Cir. 2000) .................................. 39

*United States v. Edwards,*
    442 F.3d 258 (5th Cir. 2006) .................................. 46

*United States v. Hall,*
    455 F.3d 508 (5th Cir. 2006) .................................. 41

*United States v. Hayes,*
    532 F.3d 349 (5th Cir. 2008) .................................. 46

*United States v. Hughes,*
    635 F.2d 449 (5th Cir. 1981) .................................. 46

*United States v. Johnson,*
    278 Fed. Appx. 317 (5th Cir. 2008) ........................... 49

*United States v. Nation,*
    229 Fed. Appx. 288 (5th Cir. 2007) ........................ 48, 49

*United States v. Robinson,*
    367 F.3d 278 (5th Cir. 2004) .............................. 42, 43

*United States v. Ryan,*
    215 Fed. Appx. 331 (5th Cir. Jan. 29, 2007) .................. 49

*United States v. Teague,*
    953 F.2d 1525 (11th Cir. 1992) ............................... 47

*Walbey v Quarterman,*
    309 Fed. Appx. 795(5th Cir. Jan. 19, 2009) ............ 41, 42, 44

*Wiggins v. Smith,*
    539 U.S. 510 (2003) ...................................... *passim*

*Williams (Terry) v. Taylor,*
    529 U.S. 362 (2000) .......................................... 43

# TABLE OF AUTHORITIES

**FEDERAL CASES** **PAGE(S)**

*Williams v Allen,*
 542 F.3d 1326 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**FEDERAL STATUTES**

28 U.S.C. § 2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

**STATE STATUTES**

Texas Penal Code § 22.05(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# INTRODUCTION

Julius Robinson did not receive effective assistance of counsel during his capital trial. Robinson's defense attorneys failed to investigate the prosecution's evidence regarding future dangerousness, refused to hire a mitigation specialist, neglected to conduct a reasonable investigation into his life history, and declined to have their client mentally evaluated. Due to these omissions, trial counsel were unprepared to rebut the aggravating evidence and unable to present a compelling case in mitigation. Had trial counsel effectively discharged their constitutional obligations, however, they could have presented a wealth of information more than sufficient to tip the scales in favor of life. The following table makes this abundantly clear:

| PENALTY PHASE EVIDENCE PRESENTED | AVAILABLE PENALTY PHASE EVIDENCE FOLLOWING REASONABLE INVESTIGATION |
|---|---|
| **Future Dangerousness:** | |
| Robinson asked fellow gang members to kill a prosecution witness. 20 RT 137-171; Ex.44. | Robinson had nothing to do with the robbery of Michael Williams. Exs. 8, 19, 21, 28, 34, 62, 64. |
| Robinson was affiliated with the "Crips" Gang. 20 RT 47-49, 53, 68, 116. | Robinson was never a member of any gang, certainly not a notorious criminal syndicate. Exs. 59, 72. |
| Robinson attempted to murder a teenage girl over a drug debt. 20 RT 12-20. | At nighttime, Robinson fired shots at a parked truck without knowledge that Sarah Tucker was hiding inside; the trial court initially deferred adjudication of guilt and imposed probation. Exs. 54, 74, 78, 79. |

1

| Life History: | |
|---|---|
| No information regarding Robinson's early years. | Robinson was abandoned as a toddler by drug-abusing, drug-dealing parents who were trapped in an endless cycle of violence and addiction. Exs. 1, 13, 17, 18, 24, 29, 30, 46. |
| Robinson was raised in a stable home by able-bodied grandparents. 21 RT 131-170. | Robinson was neglected throughout his childhood and was exposed to a variety of negative influences because his blind and invalid grandparents were unable to care for him. Exs. 1, 7, 12, 13, 18, 22, 23, 27, 29, 30, 33, 37. |
| Robinson enjoyed playing football though he was inconvenienced by his mother's brief experimentation with drugs. 21 RT 2-18, 46-53, 74-80. | Robinson juggled the demands of high school while struggling to support his destitute and drug-addicted mother, eventually forcing him into a life of drug dealing. Exs. 5, 7, 14, 16, 29, 30, 36. |
| **Cognitive Impairments:** | |
| No information regarding Robinson's intellectual functioning. | Robinson suffered brain damage as the result of his mother drinking alcohol through her pregnancy with him and through his chronic exposure to pesticides as a child. Exs. 1, 2, 9, 12, 16, 17, 29, 30, 37, 38, 63, 77. |
| **Character:** | |
| Robinson was liked by his football coaches and did not cause any problems in jail while awaiting his capital trial (other than making an unauthorized three-way telephone call to order a "hit" from prison). 21 RT 18-43, 54-74, 81-120. | Robinson was a kind and compassionate person as demonstrated by acting as a father to his brother's children, giving his mother a fresh start from her drug addiction, and helping his cousin turn his life around. Exs. 5, 12, 25, 35. |

Robinson has made a substantial showing that he was deprived his Sixth Amendment right to counsel. Because reasonable jurists could discuss, if not dispute, the district court's decision, Robinson is entitled to a certificate of appealability (COA). Further, because the district court denied Robinson's petition without an evidentiary hearing - notwithstanding the Government's concession - summary reversal is required.

## STATEMENT OF FACTS

**I.     Penalty-Phase Preparation:  Trial Counsel Failed to Conduct a Reasonable Investigation in Order to Spare Robinson's Life**

The federal government charged Robinson, along with forty-four other individuals, for participating in Nathan Henderson's drug-trafficking enterprise. The prosecution also charged Robinson with the murders of Johnny Shelton and Juan Reyes and for being a member of the conspiracy when Rudolfo Resendez was killed.  All three charges carried the possibility of the death penalty.

In addition to the underlying crimes, the prosecution's case for death consisted of "future dangerousness to the lives and safety of other persons, as evidenced by a lack of remorse, poor rehabilitative potential, and specific threats and acts of violence."  The prosecution provided notice of three prior bad acts:  (1) 1996 state conviction for "Deadly Conduct by Discharging Firearm at an Individual," for which he "received deferred adjudication"; (2) uncharged allegation that Robinson ordered the murder of prosecution witness, Michael "One Love" Williams; and (3) Robinson's prior membership in the "Playboy Hustler Crips."  Dkt # 1222 (Notice of Intent to Seek the Death Penalty.)

Wessley Ball and Jack Strickland were ultimately appointed to represent Robinson on the capital charges.  Robinson was a "cooperative client, fully involved in his defense."  Strickland, Resp. Ex. B at p. 6 (Aff. of Jack V. Strickland); Resp. Ex. A at p. 8 (Aff. of Wessley T. Ball) (noting that Robinson never declined to provide information in response to their requests).  Nevertheless, the defense team rarely met with Robinson.  Ball only visited his client twice in jail, the first time almost five months after his appointment and the second less

3

than a month before trial. Strickland's only jail visit occurred a full two months after the jury sentenced Robinson to death. *Id.* at p. 8.

Before conducting any investigation into Robinson's case, Ball was resigned to the inevitability of a death sentence:

When I went into this case and began to review all of the evidence, I believed that if the government could prove [the murder charges], *saving Mr. Robinson's life would be likely an impossible task.*

Resp. Ex. A at p. 12 (Aff. of Wessley T. Ball). Ball's dismal outlook was reflected in the amount of time he devoted to marshaling evidence to try to spare Robinson's life. Of the 1,318 hours that trial counsel billed in this case, only 20 hours were spent on the penalty-phase investigation. Ex. 55 (Memorandum of Jesse Wallis).

Trial counsel did not investigate the allegations used to support future dangerousness. Trial counsel did not even bother to obtain the court file for Robinson's 1996 deadly-conduct conviction from the state courthouse - just ten blocks from where Robinson was being tried.

Neither did trial counsel conduct a reasonable investigation into Robinson's life history. Ball and Strickland refused to hire a mitigation specialist. Resp. Ex. A at p. 6 (Aff. of Wessley T. Ball); Resp. Ex. B at p. 6 (Aff. of Jack V. Strickland). Ball, despite using mitigation specialists in the past, believed "the current proliferation of the use of 'mitigation specialists' is, in some instances, simply a response to the fear of 'ineffective assistance' claims." Resp. Ex. A at p. 5 (Aff. of Wessley T. Ball). Strickland, who had also used a mitigation specialist previously, criticized them as "an ever-expanding group of cottage industry self-proclaimed experts who have sprung up and carved out a niche for themselves."

4

Resp. Ex. B at p. 6 (Aff. of Jack V. Strickland). Ex. 81 (Invoice of Vince Gonzales dated 12/8/2000 in *State of Texas v. Carlis Jovonite Russell*, Case No. 0676421A.)

Bruce Cummings, the defense investigator, was not a mitigation specialist and was unable to conduct the requisite investigation. Ball first retained Cummings less than a month before trial. Ex. 55 (Memorandum of Jesse Wallis). Cummings limited the scope of his life history investigation to only those witnesses Robinson identified who "might make good fact witnesses for him." Resp. Ex. C at p. 1 (Aff. of Bruce Cummings). Cummings' first and only jail visit with Robinson occurred after trial. Ex. 80 at p. 2 (Bureau of Prisons Records) (entry that "Bruce Cummings" visited on March 19, 2002).

Not a single defense team member went to Robinson's hometown, Dermott, Arkansas. Resp. Ex. B at p. 6 (Aff. of Jack V. Strickland); Resp. Ex. A at p. 4 (Aff. of Wessley T. Ball). Despite the expressed willingness of several Dermott witnesses to assist with Robinson's case, counsel still refused to go. Ex. 56 at ¶ 9 (Aff. of Danny Burns). The defense contacted only a handful of witnesses there, all by telephone. Ex. A at p. 4 (Affidavit of Wessley Ball); Ex. 75 at ¶ 14 (Decl. of Russell Stetler). Even then, the inquiries were wholly unrelated to mitigation. Josephine Dotson was only asked if she knew anything about Robinson's attendance in school. Ex. 62 at ¶ 3 (Supp. Decl. of Josephine Dotson). Dotson referred Cummings to Bernice Johnson, and her sister, Mildred Holimon, but trial counsel never contacted them. *Id.* Willie White was questioned but only about his knowledge of Robinson's drug activities. Ex. 65 at ¶ 2 (Supp. Decl. of Willie White). Trial counsel took the same narrow approach with Robinson's brother, Marcus. Ex. 64 at ¶ 2 (Supp. Decl. of Marcus Robinson). No one asked Brenda

5

Holimon, John Holimon's wife, anything about Robinson's background. Ex. 58 at ¶ 4 (Decl. of Brenda Holimon).

The defense interviewed only two witnesses about Robinson's life history: his mother, Rose Holimon and his uncle, John Holimon. Rose was only questioned about her son's adolescence in Arlington. She was never asked about Robinson's childhood when she subjected him to drugs and alcohol in *utero*, exposed him to a violence as an infant, and abandoned him during his childhood. John Holimon had no first hand knowledge of Robinson's daily life in Dermott. John had left Dermott as a teenager, long before Robinson was born. Ex. 14 at ¶ 5 (Decl. of John Holimon, Jr.).

The remainder of the penalty-phase investigation was limited to interviewing those people Robinson identified who "might be willing to speak on his behalf," including "football and track coaches." Resp. Ex. C at p. 3 (Cummings). Cummings interviewed these witnesses as a group; trial counsel did not meet with them until trial. Ex. 26 at ¶ 4 (Decl. of Willie Nimmer). Cummings interviewed Robinson's guards in jail but only after one of the guards told Ball about Robinson's positive adjustment during a chance encounter. Ex. 82 (Memorandum to File.)

No member of the defense team had the training or experience to assess Robinson for mental or neurological impairments but Ball and Strickland still refused to hire a qualified expert. Resp. Ex. A at p. 8 (Aff. of Wessley T. Ball) ("I do not profess to be a mental health professional."); *see generally* Resp. Ex. B (Aff. of Jack V. Strickland). Just two weeks before trial, Ball complied with a request from death penalty resource counsel to contact Dr. Mark Cunnningham, a forensic psychologist. But counsel did not allow Cunningham to evaluate

6

Robinson. Notwithstanding their lack of expertise, Ball and Strickland merely assumed their client would receive a negative diagnosis. Resp. Ex. A at p. 9 (Aff. of Wessley T. Ball) (relying upon an isolated comment from Robinson, Ball concluded Robinson might be deemed a "sociopath"); Resp. Ex. B at p. 4 (Aff. of Jack V. Strickland) (claiming Robinson "exhibits the classic symptoms of an antisocial personality disorder"). Trial counsel also erroneously believed that simply conducting a psychological evaluation "allows the government's expert to likewise examine your client." Resp. Ex. B at p. 4 (Aff. of Jack V. Strickland).

## II. Penalty Phase

### A. Prosecution's Evidence Supporting Future Dangerousness

#### 1. Unrebutted Allegation that Robinson Ordered a "Hit" of Williams

In trying to show that Robinson ordered people to kill Williams, the prosecution offered a tape recording of a three-way telephone conversation between Robinson and his aunt, Josephine Dotson, and brother Marcus. 20 RT 99. According to the government, Robinson's murder directive consisted of the following statement: "That dude ONE LOVE, Man that dude right there go hard." Ex. 44 (Gov't Trial Ex. 929A).

Michael "One Love" Williams testified that he was driving around Dermott with Louis Johnson, when a group of young men, including Kendall Pitts, Keith Eddington, and Wayne Jordan, stopped the car.[1] *Id.* at 93, 140. Pitts approached with a .38 pistol, ordered Johnson out of the car and told Williams to move over as

---

[1] FBI Agent Timothy McAuliffe testified that Williams provided information about Henderson and Robinson's drug trafficking activities which enabled law enforcement to obtain twelve search warrants. *Id.* at 94.

the three men got into the car. Pitts hit Williams in the jaw with the pistol and stole twenty dollars from him. *Id.* at 142. According to Williams, Pitts said that they were going to kill him because he had "snitched off" their "OG down in Texas."

Henderson, king pin of the drug trafficking conspiracy, testified that Robinson previously discussed Williams when the two were in jail together awaiting trial.[2] According to Henderson, Robinson expressed hope that someone would "get" Williams. Although Henderson "didn't hear [Robinson] instruct anybody to do anything," *id* at 129, Henderson claimed that Robinson had discussed calling his hometown "a couple of times." *Id.* at 114. More than ten days after Williams was assaulted, Robinson told Henderson "that the youngsters in Arkansas . . . got One Love." *Id.* at 115.[3]

During the prosecution's rebuttal, the government tried to link Robinson's role in the assault on Williams to the future dangerousness allegation. Peter

---

[2] Henderson pled guilty to the possession of over 100 kilograms of marijuana and possession of a firearm, 20 RT 106-08, and faced a punishment range from ten years in prison to incarceration for life. Pursuant to his plea agreement, the Government agreed to move for a downward departure of Henderson's sentence under the sentencing guidelines.

[3] Henderson's testimony was speculative:

> I don't know what kind of conversation they had on the phone. I just know if someone is snitching in Dermott and there is a message gave them down there, that means get them. Stop them from talking.

20 RT 115.

Carlson, a former warden with the United States Bureau of Prisons, testified that if Robinson was sentenced to life without the possibility of parole, Robinson would still have a number of privileges, including access to telephones during off-duty hours with a phone list and limited numbers of minutes each month. According to Carlson, it would be difficult for the Bureau of Prisons to restrict Robinson's use of three-way calls to commit additional offenses from prison. 22 RT 116-17.

### 2. Unrebutted Allegation that Robinson Was a Member of a Violent Gang

In the absence of any defense objection, the prosecution also portrayed Robinson as a gang member. 20 RT 45-69. Terence Holimon testified that Robinson had once been part of the "Crips" gang in Dermott. *Id.* at 48.[4] Holimon described the gang as poorly organized and denied "beating up on people or [being] involved in 'the drug business.'" 20 RT 64-65. According to Holimon, the gang activity "was all pretty juvenile, pretty silly," essentially limited to driving around "throwing you little 'gang' signs up and . . . hollering and doing a whole lot of crazy stuff. . . ." *Id.* at 66.

The prosecution relied on its prison expert, Carlson, to link Robinson's prior gang membership to future violence in prisons. 22 RT 107. "[p]rison gangs do play a significant role in prison operations. Nearly all violence, serious violence, within a correctional setting, can be traced back to gang rivalries. . ." 22 RT 112-13.

---

[4] Terrence also identified a photo of Robinson, claiming Robinson was making a gang sign with his hands. *Id.* at 49 (Prosecution Exhibit 634).

### 3. Unrebutted Allegation that Robinson Attempted to Murder Tucker

Sarah Tucker, who was in prison for grand theft and forgery, testified regarding the events leading to Robinson's conviction for deadly conduct. In 1995, Robinson tried to recover money Tucker owed him for drugs. 20 RT 18-19. Tucker alleged that when she refused to answer the door at her apartment, Robinson hunted her down at her parent's residence. 20 RT 18-20. According to Tucker, Robinson made eye contact with her shortly before firing seven shots into the truck where she was sitting. *Id.* at 14, 20; 20 RT 12-13.[5]

### B. Defense's Presentation

Having failed to investigate any of the evidence offered in aggravation, the defense presented no rebuttal, offering instead, limited evidence about Robinson's character and background.

To explain his life history, trial counsel relied exclusively on Rose and John Holimon. Trial counsel had no idea Rose was mildly mentally retarded with an IQ score of 65. Ex. 46 at p. 4, 2 (Dr. Barna, Psych. Report for Rosie Mae Holimon). Ball was aware, however, that Rose "minimize[d] her dysfunction." Resp. Ex. A at p. 6 (Aff. of Wessley T. Ball). According to Ball's investigator, Rose was "determine[d] to paint a rosier picture of her role as a parent and to not take responsibility for the upbringing of Robinson." Resp. Ex. C at pp. 3-4 (Aff. of Bruce Cummings).

---

[5] Tucker's mother, Ozla Ann Tucker, testified regarding the shots that had struck her empty residence. 20 RT 36-44. The jury also received the final judgment for the deadly-conduct conviction. 20 RT 11-12; Gov't Trial Ex. 925.

As defense counsel anticipated, Rose Holimon omitted critical information about her son's tragic upbringing. Rose explained that she married at age fifteen but she failed to tell the jury that she was still a teenager at the time she gave birth to both Marcus and Robinson, that she dropped out of high school immediately after becoming pregnant, and that she abused alcohol and drugs, including while she was pregnant with Robinson. 21 RT 156. Rose's testimony also left out compelling details of her chaotic marriage to Jimmie Lee Robinson. Rose did not disclose the pervasive domestic violence and drug addiction that occurred throughout Robinson's infancy. Although Rose acknowledged that the marriage ended after six years, 21 RT 158-59, she implied that the marriage ended amicably rather than as the result of Jimmie Lee's arrest for domestic abuse.

Rose also minimized her role in the abandonment of Robinson and his brother. Rose testified that, after the marriage ended, she lived with her sons in Wichita Falls until Robinson was four years old. 21 RT 159. In reality, Rose left her children with her aging and infirm parents when Robinson was only two.

Rose grudgingly admitted to drinking "all the time" but only when Robinson reached adolescence and she was deliberately vague about the details. 21 RT 167-68. According to Rose, it was her co-workers who first exposed her to a marijuana and cocaine concoction known as "primos." 21 RT 167. Rose downplayed the severity of her addiction, claiming she "continued for a little while, and then [she] beat it." 21 RT 168.

Robinson's uncle, John Holimon, Jr., was the only witness to testify regarding Robinson's childhood in Dermott. Because he left Dermott long before Robinson was born, however, John Holimon lacked any firsthand knowledge of Robinson's day-to-day life. Ex. 14 at ¶ 5 (Decl. of John Holimon, Jr.). Holimon,

11

drawing from his own experience as a child, described his grandparents as providing a "stable environment" in a "decent home." 21 RT 142, 151. Although John Holimon also claimed that Robinson lived in a "very dangerous environment" with Rose, he had only visited "a couple of times." 21 RT 142.

The remainder of the mitigation presentation was limited to witnesses who barely knew Robinson. Football players and coaches described Robinson as hardworking and respectful based upon their limited interaction with Robinson at school and on the gridiron. *See generally*, 21 RT 2-6, 11-15, 44-45, 47-48, 75-79.[6] Several guards from the detention center testified favorably regarding Robinson's behavior based upon the limited time he spent in pretrial confinement on the capital charges. 21 RT 19-21, 54-63, 68-72, 81-85, 87-97.[7]

Finally, even though defense counsel believed their expert, Cunningham, had a reputation for being "long-winded" "pedantic" "arrogant," and "argumentative," they still called him to testify. Resp. Ex. B at p. 3 (Decl. of Strickland). The defense circumscribed Cunningham's testimony to discuss only future dangerousness for death row inmates generally. 22 RT 13-30.[8] Because

---

[6] Landry Burdine, one of the football players, was called only after being discovered in the courtroom gallery during trial. Ex. 4 at ¶¶ 3-4 (Decl. of Burdine).

[7] The defense also called Debra Wesson, the records custodian at CCI Training Center, who confirmed that Robinson attended only 200 of 308 hours for a computer course. *Id.* at 121-27.

[8] The parties stipulated to Robinson's Bureau of Prison records including period reviews conducted by a prison psychologist, Jim Womack. 22 RT 11. It included a recitation that Robinson' "current potential for harm to others is judged to be low." The stipulation included the Government's reluctance to seek death

12

Cunningham was prevented from talking to Robinson, his opinion was based exclusively upon Robinson's prison records, including various psychological evaluations. *Id.* at 28. Drawing from his own studies that tracked capital offenders in prison and violence rates in federal and state prisons, Cunningham concluded that Robinson posed no threat if incarcerated for life. *Id.* at 43.

During closing argument, Robinson's trial counsel emphasized future dangerousness as the "key consideration" in the case. 23 RT 82. As trial counsel explained: "when it comes right down to the [sic] lick law, if one factor needs to be carved out, [future dangerousness is] the one that's most important to most jurors." 23 RT 83.

The prosecution hammered its case in aggravation to the jury. 23 RT 63, 66-67, 99, 106. Twice, the prosecutor implied that Robinson attempted to murder Tucker over a petty debt. 23 RT 63 ("Sarah Lee Tucker owed him a $100 for crack cocaine. So she's a problem. We'll take care of that"); *Id.* at 120 ("he is willing to shoot up that pickup truck with this little girl in it"). The prosecutor also emphasize the allegation that Robinson ordered Williams to be killed. 23 RT 66 ("he starts calling up to Arkansas using that little three-way call – that nobody knew about – talking, trying to see if he can get something done about Michael Williams. And what happens Michael Williams is, in fact, kidnapped, taken away. People are going to kill him."). Indeed, the prosecutor claimed that "One Love" incident proved Robinson would continue to pose a risk of violence from prison. 23 RT 105 ("the overwhelming evidence is that he is, because with the telephone available to him as will be available to him at any prison setting, he is prepared

---

against a number of Robinson's co-defendants. *Id.* at 12-13.

13

to carry out whatever it takes to seek revenge on anybody"); 23 RT 102 ("the overwhelming evidence on that future dangerousness issue sadly is that Julius Robinson will always be a future danger . . . [E]very one of the courageous individuals who came down here to testify against him is now a target"). 23 RT 64. Finally, the government characterized the defense presentation as a charade:

> . . . Julius Robinson has two faces. [¶] The face that he portrays to all his coaches, good, kind, polite, ready to work hard, teamwork. . . . And when they are not looking at him, he's selling dope. And he's shooting at Sarah Tucker.
>
> * * *
>
> That's the real Julius Robinson.

23 RT 64-65.

In the absence of any rebuttal evidence from the defense, the jury sided with the prosecution. As part of the penalty phase verdict, the jury was required to answer whether Robinson "is a future danger to the lives and safety of other persons." Ex. 45 at p. 4 (Special Verdict Form). The jury unanimously answered the question in the affirmative, finding that it warranted the imposition of the death penalty. *Id.* Another special verdict form, crafted and submitted by defense counsel, asked whether "Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?" Ex. 45 at p. 7 (Special Verdict Form) Not one of the jurors concluded that Robinson's background justified a lesser sentence. *Id.* (reflecting "0" ). The

14

jury ultimately imposed two death sentences for the murders of Shelton and Reyes and a sentence of life without possibility of parole for the murder of Resendez.

## III. Habeas Proceedings

In post-conviction proceedings, federal habeas counsel completed the requisite penalty-phase investigation that trial counsel refused to undertake at the time of trial. This presentation, which consisted of hundreds of pages of records, and statements from dozens of witnesses, paints a much different picture than the one provided to Robinson's jury.

### A. Rebuttal Evidence to Prosecution's Case in Aggravation

Had trial counsel investigated the aggravating evidence, the defense could have refuted the prosecution's contention that Robinson posed a future danger from prison.

### 1. The Prosecution's Allegation That Robinson Ordered a "Hit" Was False

If trial counsel had investigated the incident involving "One Love", they would have learned that the Government's "hit" allegation was not true. The alleged co-conspirators in the kidnaping of Michael Williams denied any connection to Robinson whatsoever. Alquantis Kentrel Pitts, the mastermind behind the Williams' attack, admitted he was unable to pay for car repairs so "Pitts decided to rob One Love to get money to get [his] car back." Ex. 28 at ¶ 3 (Decl. of Alquantis Pitts) Pitts' cohorts also confirmed that Robinson played no role in the spontaneous robbery of William. Ex. 8 at ¶ 2 (Decl. of Keith Edington) (denying having any "relationship with Julius" or " tak[ing] orders from him."); Ex. 21 at ¶ 15 (Decl. of Wayne Jordan) ("At no time during the entire incident did I hear anyone threaten to kill One Love, nor did I hear anyone make any comment

15

about One Love providing information or giving testimony against Julius Robinson.")

Even the victim and his companion confirm the story of their attackers. Louis Johnson never heard Robinson's name mentioned, much less thought that the incident was a botched vengeance killing. Ex. 19 at ¶ 7 (Decl. of Louis Johnson); Ex. 34 (Decl. of Mike Williams). Williams expressed skepticism of Robinson's involvement: "I believe that the young men wanted money from me, and this was the cause of the incident. I do not believe that they had really been ordered by Julius Robinson to kill me." Ex. 34 at ¶ 3 (Decl. of Mike Williams).

Josephine Dotson and Marcus Robinson, the relatives who allegedly relayed Robinson's "hit" order, also denied the allegations. According to Marcus, the phrase "go hard" simply meant that a person "would do anything, say anything." Ex. 64 at ¶ 4 (Supp. Decl. of Marcus Jwain Robinson). Marcus did not believe that Robinson was asking him to convey a message and he did not tell anyone about the conversation. Ex. 62 at ¶ 6 (Supp. Decl. of Josephine Dotson). Josephine "certainly did not do anything following that conversation or talk [to] anyone about it." *Id.* Neither did Marcus. Ex. 64 at ¶ 4 (Supp. Decl. of Marcus Jwain Robinson).

Finally, the defense could have impugned Henderson's testimony that Robinson made these incriminating statements in the presence of his cellmate, Steven Toston. Had they interviewed Toston, he would have contradicted Henderson's story: "[a]t no time did Julius ever say to Nate in my presence that Julius intended to harm or 'get' One Love or anyone else, or that he intended to ask someone in Dermott to harm One Love." Ex. 84 at ¶ 4 (Decl. of Steven Toston).

16

### 2. Robinson's Alleged Involvement with a Notorious Street Gang Was Nothing More Than a Group of Adolescent Hoodlums

Trial counsel could have successfully barred the gang evidence altogether. Supreme Court precedent holds that the introduction of irrelevant gang membership evidence in a capital proceeding is constitutional error. *Dawson v. Delaware*, 503 U.S. 159, 165-67 (1992) (finding constitutional error where the prosecution introduced irrelevant evidence of defendant's membership in the Aryan Brotherhood at sentencing).

Even if defense counsel could not have excluded the gang allegations, they could have certainly minimized their impact. Jerry Melton, Dermott's Police Chief when the Dermott "Crips" would have been active, scoffed at the suggestion that the group was a fearsome gang: "[t]hey didn't fight each other . . . and I looked at them as kids trying to imitate what they saw on television. They were little wannabes." Ex. 59 at ¶ 4 (Decl. of Jerry Melton).

Trial counsel could have also consulted an expert to assess the gang situation in Dermott. According to a U.S. Department of Justice study, gangs are generally classified into five categories: (1) Traditional (2) Neo-traditional (3) Collective (4) Specialty and (5) Compressed. Malcolm W. Klein, Cheryl L. Maxson, *Gang Structures, Crime Patterns, and Police Responses: A Summary Report* (2001), available at www.ncjrs.gov/pdffiles1/nij/grants/188510.pdf. Traditional gangs are long-standing, fairly large (consisting of 100 or more members), and have clear stratification based upon age or subgroup and fiercely territorial. *Id.* Neo-traditional are similar but have not been in existence as long traditional gangs. Collective gangs are slightly smaller, less territorial, have less

stratification based upon age, and generally in existence for a decade. *Id.* Speciality gangs are similar to the other gangs but also resemble a criminal syndicate, usually focused on a single criminal activity. *Id.*

The Dermott "Crips" met none of the criteria for the four most dangerous categories. According to Dr. Malcolm Klein, the Dermott Crips was a Compressed gang characterized by their small size, total absence of stratification, and short life span. Ex. 72 at ¶¶ 4, 3c (Decl. of Malcolm Klein).

### 3. Robinson Shot Into a Parked Truck Without Knowledge That Tucker Was Inside

Readily available police reports and court records would have impeached Tucker's testimony that Robinson knowingly fired shots at her. *See* Ex. 78 (Arlington County Police Department records re: Sarah Tucker incident). In her initial account to police, Tucker said she had been parked in front of her mother's house for ten minutes when she saw Robinson in the brown car. *Id.* at p. 22. At no time did Tucker tell the police that Robinson had initially gone to her apartment or that he followed her to her parents' home. *Id.* at pp. 20-25. Crime scene investigators confirmed that all of the bullets were found in the rear portions of the vehicle and none were fired directly into the passenger cab. *Id.* at p. 20.[9] Tucker also told police that Robinson's vehicle initial passed her truck without confrontation and then departed the scene "very slowly." *Id.* at p. 24. All of this provides strong circumstantial evidence that Robinson did not see Tucker but fired at her empty truck in frustration.

---

[9] One of the rounds fired into the tailgate had passed through and hit the back seat.

18

Trial counsel never interviewed the driver of the car, Richard Smart, a government witness. Had they bothered to question Smart about the incident, trial counsel would have discovered that Smart and Robinson "did not see anyone inside it . . . [and] both believed the truck was empty." Ex. 74 at ¶ 3 (Decl. of Richard Smart).

The court disposition also confirms the minor nature of the offense. Robinson pled guilty to deadly conduct, the knowing discharge of a firearm, a third degree felony. Ex. 79 (Tarrant County court records). The punishment range for the offense was from two to ten years in prison. *See* Texas Penal Code § 22.05(e) (classifying the offense of discharging a firearm as a "felony of the third degree.") Instead, the judge gave Robinson five years of probation and "deferred [proceedings] without entering an adjudication of guilt." *Id.* at p. 4.

Robinson's defense attorney in the assault case, Michael Gregory, would have confirmed that the disposition of deferred adjudication was based upon a substantial lack of evidence of the attempted murder charge. According to Gregory, the state prosecutor was open to the lesser offense of deadly conduct charge. in part, because "the evidence may not have supported a finding that there was any intent to kill." Ex. 86 at ¶ 4 (Decl. of Michael Gregory). Gregory believed that "[t]he fact that a deferred probation was offered also indicates that the State did not feel that Robinson was a threat to commit further acts of violence." *Id.*

**B.    Reasonably Available Mitigation Evidence**

**1.    Robinson Suffered a Chaotic Infancy and Was Raised by Violent, Drug-Addicted and Drug-Dealing Parents**

Julius Robinson grew up in an environment of poverty, racism, neglect, abuse and alcoholism.[10]

Rose Holimon, Robinson's mother, began to drink alcohol and smoke marijuana almost every day when she was twelve or thirteen. Ex. 17at ¶ 8 (Decl. of Rose Holimon). Rose quit school at age sixteen, after she became pregnant with Robinson's brother; she was only 18 when Robinson was born. Ex. 10 (Decl. of Guffrie Gorins). Shortly after marrying the father, Jimmie Lee Robinson, the couple moved to North Carolina when Jimmie Lee joined the Army. *Id.* at ¶ 14.

Given her intellectual handicaps, Rose constantly endangered her sons' health and well-being. Ex. 46 at pp. 2, 4 (Dr. Barna, Psych. Report for Rosie Mae Holimon) (Rose is considered mildly mental retarded and has an IQ of 65.)). Rose drank alcohol and abused drugs constantly, even while pregnant with Robinson. She "drank a minimum of two to three beers" and "smoked a half an ounce of marijuana" throughout her pregnancy with Robinson. Ex. 29 at ¶ 17 (Decl. of Jimmie Lee Robinson); Ex. 17 at ¶ 13 (Decl. of Rose Holimon) ("Once I found out

---

[10] According to current economic statistics, Dermott has about 3500 people. Compared to the rest of Arkansas, its median income ($18,000 per year in 2000) is significantly below the state average, as is its household value. Its unemployment rate of over 13% is well above the state average. Only a third of the town's residents are married. The percentage of its population that is institutionalized is significantly above the state average; the percentage with a college education is significantly below.

I was pregnant [six months later], I stopped smoking [marijuana]. The doctor said I should stop drinking beer, but I didn't."); Ex. 24 at ¶ 4 (Decl. of Beotha Moore). Rose did not seek prenatal care until her third trimester. *Id.*; *cf.* Ex. 38 at p. 7 (Medical records of Robinson) (first prenatal record dated May 6, 1976, at p. 3; Robinson was born August 11, 1976.).

The effects of the *in utero* alcohol exposure were apparent at Robinson's birth. Growth retardation, such as low birth weight or height, is one of the diagnostic criterion for fetal alcohol syndrom. Ex. 77 at pp. 6-7 (Report of Dr. Kate Allen); Ex. 47 (FETAL ALCOHOL SYNDROME: GUIDELINES FOR REFERRAL AND DIAGNOSIS, CENTER FOR DISEASE CONTROL.). At delivery, Robinson weighed only five pounds, six ounces, after 42 weeks of gestation. Ex. 38 (Medical Records, at p. 14); Ex. 48 (Robert C. Vandenbosche & Jeffrey T. Kirchner, INTRAUTERINE GROWTH RETARDATION, Am. Fam. Physician. 1998 Oct 15:58(6):1384-90.) The doctors designated Robinson as "SGA," "small for gestational age." Ex. 38 (Cape Fear Medical Records, at p. 3); Ex. 50.[11]

---

[11] Rose had too much amniotic fluid in her uterus, a condition known as "polyhydramnios," a correlative to congenital malformations, including birth defects affecting the central nervous system and commonly caused by in utero alcohol exposure, Ex. 51 (Stoll CG, Roth MP, Dott B, Alembik Y, STUDY OF 290 CASES OF POLYHYDRAMNIOS AND CONGENITAL MALFORMATIONS IN A SERIES OF 225,669 CONSECUTIVE BIRTHS, Community Genet, 2(1):36-42 (1999) (more common congenital malformations are associated with polyhydramnios were cardiac, digestive, central nervous system, musculoskeletal, and urinary)); Ex. 52 (C.L. McGee & E.P. Riley, BRAIN IMAGING AND FETAL ALCOHOL SPECTRUM DISORDERS, Ann. Ist. Super. Sanita, 42(1):46-52 (2006) ("Over thirty years of research has revealed that prenatal exposure to alcohol has a devastating impact on the structure and function of the developing central nervous system.")).

21

Rose's chronic drug and alcohol abuse continued throughout Robinson's infancy and early childhood. Ex. 29 at ¶ 19 (Decl. of Jimmie Lee Robinson) ("Drugs, alcohol and violence were the order of the day in our house."). Instead of caring for Robinson, Rose hosted "Soap Opera" parties, informal gatherings devoted to drug and alcohol consumption. *Id.* at ¶ 18. She squandered their family savings to purchase cocaine for herself and her friends. *Id.* Robinson's parents sold drugs to support themselves. Ex. 29 at ¶ 10 (Decl. of Jimmie Lee Robinson).

Fueled by their constant intoxication, Robinson's parents were hostile toward one another and frequently combative. Jimmie Lee "hit Rose several times" and "push[ed] and shove[d] her." *Id.*; Ex. 24 at ¶ 2 (Decl. of Beotha Moore). Jimmie Lee beat Rose until she had "a black eye, a cut lip or bruises." Once, Jimmie Lee, armed with a gun, burst into the home of Bernice Johnson looking for his wife to kill her. Ex. 18 at ¶ 5 (Decl. of Bernice Johnson). For her part, Rose "had a serious habit of picking things up and hitting [Jimmie Lee] with them." Ex. 29 at ¶ 19 (Decl. of Jimmie Lee Robinson). Family arguments often ended with Jimmie Lee hitting, kicking and stomping Rose. *Id.* The violence went unabated, even while Rose was pregnant with Robinson. *Id.* at ¶ 6. Jimmie Lee continued to hit Rose in her face and throw her to the ground. *Id.*; Ex. 24 at ¶ 4 (Decl. of Beotha Moore). As Marcus recalled, "My parents were always arguing and when they fought, it was physical fights with hitting and punching." Ex. 30 at ¶ 2 (Decl. of Marcus Jwain Robinson). After one argument, Jimmie Lee was arrested. *Id.* at ¶ 20.

Sarah Pittman, a family friend who lived with the Robinsons, could not stop the fighting. For Marcus's protection, Pittman decided to remove him from

22

the home and raise him in Dermott. *Id.* Once Robinson was born, Rose reclaimed Marcus from Pittman and returned to North Carolina. Ex. 7 at ¶ 15 (Decl. of Josephine Dotson). Rose was just eighteen years old at the time. Unable to receive help from military authorities, Rose struggled to provide for her two children. Rose pestered her sister and father for money because she did not have enough to cover food or rent. *Id.* Instead of supporting his family, Jimmie Lee lived with other women. *Id.*

As their fighting intensified, the Robinsons feared that child protective services would remove the boys from their home. Ex. 13 at ¶ 8 (Decl. of Milton Holimon) ("Rose and Jimmie Lee were fighting too much and the authorities were getting ready to take the children away from them.")).[12] Rather than mend their ways, they sent their children 850 miles away to Dermott to live with Rose's parents. *Id.*; Ex. 7 (Decl. of Josephine Dotson). Robinson was just two years old.

The temporary placement turned into a permanent desertion. Ex. 29 at ¶ 25 (Decl. of Jimmie Lee Robinson). After Rose and Jimmie Lee separated, Robinson and his brother would rarely see their parents. Jimmie Lee had little contact with his sons, seeing them two to three times and occasionally sent clothing. Ex. 30 at ¶ 6 (Decl. of Marcus Jwain Robinson). According to Marcus, Rose had even less involvement in her children's lives:

> She came to see us once or twice in all the time we lived
> with our grandparents and she never sent us anything.
> When our mother visited Dermott, she was on the go all
> the time, partying and going out with her friends. She

---

[12] Even the Government grudgingly concedes that Robinson's parents provided "inadequate care." Resp. at 42 n.11.

really didn't spend the time with my brother and me. *Id.* at ¶ 6. In short, Robinson and his brother "ended up without a mother or a father." Ex. 29 at ¶ 25(Decl. of Jimmie Lee Robinson).

Following his abandonment, Robinson began exhibiting signs of emotional disturbance. Bertha Robinson noticed "something odd about Robinson. When he became angry, he would sit in a corner and cry and stew for an inordinate amount of time for a child." Ex. 29 at ¶ 32 (Decl. of Jimmie Lee Robinson). Bernice Johnson, an older relative, also observed Robinson's difficulties: "Julius always had a temper when he was young, often over nothing. If he wanted something and couldn't have it, he would have a tantrum and scream and cry." Ex. 18 at ¶ 7 (Decl. of Bernice Johnson). Robinson's behavior became even more intense as he got older, often resulting in temper tantrums. Ex. 29 at ¶ 33 (Decl. of Jimmie Lee Robinson) (explaining that Robinson would "cry and cry and cry").

**2. Robinson Spent the Remainder of His Childhood Neglected by Disabled and Disinterested Grandparents**

Due to the psychological and emotional trauma Robinson experienced as an infant, he required more, not less, attention during his formative years. Unfortunately, Robinson was passed off from grandparent to grandparent, each less capable than the other at providing the care essential for Robinson's development.

The boys were foisted upon Rose's parents, the Holimons, who had already struggled to raise their own children. Ex. 7 at ¶ 4 (Decl. of Josephine Dotson). John Holimon attended school only to the fourth grade. He worked as a field hand until he injured his eye in an accident. He gradually lost the eyesight in the

remaining eye, and, despite surgery, became totally blind. *Id.* Margaret Holimon was illiterate. She worked as a field hand all her life, chopping cotton and picking beans. Margaret was "on the slow side and didn't seem to be grounded enough to keep control of the family." Ex. 33 at ¶ 9 (Decl. of Willie White). She was also ill-equipped for motherhood. Ex. 13 at ¶ 7 (Decl. of Milton Willis Holimon) (confirming that his mother never applied discipline); Ex. 12 ¶ 4 (Decl. of Mildred Holimon (same)).

By the time Robinson arrived in Dermott, John and Margaret Holimon were older and even less capable of handling the demands of parenthood. The Holimons survived on John's welfare benefits and struggled even more with the addition of Robinson and Marcus. The grandparents had difficulty providing the boys with the bare necessities. Ex. 27 at ¶ 3 (Decl. of Willie Parker) (noting that Robinson received the free lunch program at school).

Due to their own limited education, "[t]he grandparents were . . . ill-prepared to educate and care for their grandchildren." John and Margaret Holimon were also too feeble to provide the structure and discipline the young Robinson needed. Margaret "had a lot of memory loss and wasn't that aware of Robinson's problems." Ex. 18 at ¶ 10 (Decl. of Bernice Johnson); *see also* Ex. 29 at ¶ 36 (Decl. of Jimmie Lee Robinson) ("Margaret is a simple person who could not deal with the difficulties [Robinson] had."). Margaret also maintained the same hands-off approach with Robinson she had with her own children. Ex. 12 at ¶ 8 (Decl. of Mildred Holimon) ("I never saw or heard my parents disciplining the boys [Robinson and Marcus]."). John's blindness necessarily impaired his ability to monitor Robinson's activities. Ex. 18 at ¶ 10 (Decl. of Bernice Johnson) ("John was blind, so he wasn't always aware of what Julius was doing."). At times,

Robinson's care was assumed by his paternal grandmother, Bertha Scales Robinson. Although Bertha had greater mental acuity than Margaret, she was paralyzed and bed-ridden. Ex. 30 at ¶ 8 (Decl. of Marcus Jwain Robinson). Ex. 29 at ¶ 4 (Decl. of Jimmie Lee Robinson).

Throughout his childhood, Robinson was constantly exposed to pesticides. The Holimon property was very near a farm and was sprayed 2 to 3 times a week with pesticides by crop dusting aircraft, often when Robinson and the other children were playing in the fields. Ex. 7 at ¶ 17 (Decl. of Josephine Dotson); Ex. 12 at ¶ 7 (Decl. of Mildred Holimon); Ex. 30 at ¶ 7 (Decl. of Marcus Robinson); Ex. 29 at ¶ 2 (Decl. of Jimmie Robinson). *See also* Ex. 16 (Decl. of Jana Holimon); Ex. 29 (Decl. of Jimmie Lee Robinson); Ex. 10 (Decl. of Guffrie Gorins).

At age five, Robinson was sexually molested. Ex. 29 at ¶ 33 (Decl. of Jimmie Lee Robinson). When his father questioned him about the touching, Robinson became hysterical: "[H]e pitched a fit the likes of which I had never seen anyone throw in my life. Robinson thrashed about, hitting and throwing himself against things and screaming uncontrollably." Ex. 29 at ¶ 33 (Decl. of Jimmie Lee Robinson). Nothing was done to help Robinson.

At age eight, Robinson started drinking alcohol and was drunk at twelve. Ex. 1 at p. 22 (Decl. of Mark Cunningham). By seventh grade, Robinson was consuming large quantities of liquor on a frequent basis and occasionally, went to school intoxicated.

By adolescence, Robinson craved attention. As one teacher observed, "[t]he attention Julius would have needed to come from his parents, he ended up getting from his peers." Ex. 27 at ¶ 4 (Decl. of Willie Parker). The only person to provide

that attention was his gang-affiliated cousin, Rodney White, who introduced Robinson to "John-John" Wright. Ex. 30 at ¶ 11 (Decl. of Marcus Jwain Robinson). One by one, Rodney and John-John "initiated" Dermott youth, including Robinson, into his psuedo-gang through violent beatings. Ex. 23 at ¶ 5 (Decl. of Carl McCree). The beating Robinson suffered was brutal: "[T]he other kids had hit [Robinson] with bottles" and injured him so severely "that it took [ ] one month to cure him." Ex. 29 at ¶ 35 (Decl. of Jimmie Lee Robinson).

Unfortunately, there was no one at home willing or able to look out for Robinson. Leroy Kennedy, Robinson's youth counselor, described "the grandparents' home" as a "chaotic and "[un]stable environment." Ex. 22 at ¶ 5 (Decl. of Leroy Kennedy). Willie Parker, Robinson's childhood football coach, held a similar view, surmising that Robinson "grew up in the streets without parental guidance." Ex. 27at ¶ 2 (Decl. of Willie Parker).

3. **Robinson Struggled Throughout His Adolescence and Early Adulthood To Help his Drug-Addicted, Emotionally Absent Mother**

Ultimately, Robinson went to live with his mother in Arlington, Texas, where his life worsened. Ex. 37 (School Records of Julius Robinson). Rose was still the same alcoholic and drug addict. Whenever payday arrived, Rose rewarded herself with a bottle of whiskey which lasted "about four or five days." Ex. 30 at ¶ 15 (Decl. of Marcus Jwain Robinson). She also smoked marijuana laced with cocaine. *Id.* at ¶ 18; Ex. 16 at ¶ 4 (Decl. of Jana Holimon). Her behavior fluctuated between stuporous and irate. Ex. 14 at ¶ 9 (Decl. of John Holimon, Jr.). John Holimon observed during his visits that Rose was " was often drunk" and exhibited a "real temper." *Id.*

Robinson loved his mother and often pleaded with Rose to quit using drugs and drinking, always to no avail. Ex. 5 at ¶ 12 (Decl. of Jamila Camp).; Ex. 30 at ¶ 16 (Decl. of Marcus Jwain Robinson). Rose denied her addictions, even to her brother:

> I would say to her, Rose, you have been drinking too much and I think you should slow down. She would get really made at me, yell "don't tell me how to live my life," and walk out, slamming the door. She would be staggering drunk and slurring her words.

Ex. 14 at ¶ 9 (Decl. of John Holimon, Jr.).

David York, the football coach, had "the impression that Robinson didn't really have anyone at home to care for him." Ex. 36 at ¶ 2 (Decl. of David York ). York was right. Rose could not provide food, clothing or shelter for Robinson. She often called her father because "she didn't have any money for the rent or food." Ex. 7 at ¶ 15 (Decl. of Josephine Dotson). They sent Rose what little money they had. As Mrcus recalled, the situation was bleak:

> I remember not having anything to eat but potatoes with ketchup or hot sauce for days, waiting for my mother to get her paycheck. That's all the food there was in the house.

Ex. 30 at ¶ 15 (Decl. of Marcus Jwain Robinson).

When Rose quit working, the situation became dire. Ex. 5 at ¶ 12 (Decl. of Jamila Camp). Though Robinson wanted to support his family, the employment opportunities for a young adolescent without a high school diploma were

nonexistent. Desperate and destitute, Robinson resorted to selling drugs. Ex. 7 at ¶ 19 (Decl. of Josephine Dotson).

Coach York observed how Robinson's problems at home shaped his life choices:

> [m]y experience working with kids has taught me to recognize the kids whose home life is compromised. I am convinced that if Robinson had grown up in a different environment, he would have had another kind of life.

Ex. 36 at ¶ 2 (Decl. of David York).

### 4. Robinson Suffered Cognitive Impairments as a Result of His Chronic Exposure to Alcohol in *Utero* and Pesticides in Childhood

Because trial counsel never obtained Robinson's full school records nor talked to any of his teachers, they lacked a complete picture of his academic struggles. Because trial counsel never investigated Robinson's life history, Robinson was never evaluated to determine the impact of his mother's tobacco smoking, alcohol abuse, and drug use during pregnancy or the effect parental neglect. Because trial counsel never investigated their client's exposure to pesticides, they never had their client evaluated to determine its effects. Trial counsel had no idea of the physical and psychological impact these factors had on their client.

From the beginning, Robinson was considered a "slow learner." Ex. 27 (Decl. of Willie Parker). Robinson struggled in the third grade and had to repeat

the entire year. Ex. 37 (School Records of Julius Robinson). His grades were seldom above the "C" level.

Arlette Gorins taught Robinson in the seventh grade in her remedial English class. Ex. 9 at ¶ 2 (Decl. of Artlette Gorins). Although Robinson was "not a troublemaker," Gorins found him to be "academically slow" and gave him an "F" in her class." Robinson received a "B in geography" but Gorins observed that "most students . . . received either an A or a B, whether they earned it or not." *Id.*

Robinson also did poorly in high school. In Dermott, Robinson was a "Resource student," and received "special assistance with his school work." Ex. 27 at ¶ ¶ 2-6 (Decl. of Willie Parker). Robinson's academic progress continued to suffer in Arlington. As his teacher, Carol Wilson explained, "Julius was not a strong academic student as is borne out by his transcripts." Ex. 35 at ¶ 5 (Decl. of teacher Carol Wilson). Robinson repeated some classes in summer school; others were modified to make it easier for him to pass. *Id.* (noting that "R" in records indicated "repeat" and "M" indicated "modified"). Robinson had a "C-" grade average and was in the lower third of his class." But even these substandard grades were actually "inflated by his physical education grades." Ex. 35 at ¶ 5 (Decl. of Carol Wilson). "Although Robinson graduated from high school, he had to transfer to Venture Alternative School, an institution for students who had difficulty dealing with regular instruction methods. Ex. 35 at ¶ 5 (Decl. of Carol Wilson).

Robinson's struggle in school was directly linked to his constant exposure to harmful substances beginning in his pregnancy and continuing throughout his childhood. Alcohol is a teratogen that, if consumed during pregnancy, produces significant neuropsychological deficits, including learning disabilities and

attention-related problems,[13] the most profound of which affecting executive functioning.[14] Ex. 1 at p. 18 (Decl. of Mark Cunningham); Ex. 77 at pp. 3-5 (Report of Dr. Kate Allen) ("thinking and behavioral problems which arise from deficits in executive functioning are the most disturbing effects of the most damaging teratogen - alcohol"); Ex. 53 (Connor PD, Sampson PD, Bookstein FL, Barr HM, Streissguth AP, DIRECT AND INDIRECT EFFECTS OF PRENATAL ALCOHOL DAMAGE ON EXECUTIVE FUNCTION, Dev. Neuropsychol. 18(3):331-54 (2000)).

Kate Allen, a licensed clinical social worker and expert in alcohol related neurodevelopmental disorder, provided further confirmation that Robinson suffered cognitive impairments from fetal exposure to drugs and alcohol, exposure that compromised his executive functioning:

> Because Julius's mother injured him *in utero*, he was at
> high risk for other maternal failures (impaired
> attachment), and was made particularly vulnerable to the
> dangerous challenges of high-risk environments (abuse,
> neglect, poverty, drugs, discrimination, violence). These
> three causative factors (teratogenic exposure, poor
> attachment, severe neglect amidst danger) - the latter two
> being correlated to fetal toxic exposure - are ample

---

[13] Dr. Martin's findings of cognitive impairments are entirely consistent with the effect of alcohol exposure *in utero*. Ex. 1 at pp. 17-18 (Decl. of Mark Cunningham).

[14] Executive functioning refers to the group of cognitive abilities produced in the frontal cortex of the brain such as self-regulation of behaviors, sequencing of behaviors, cognitive flexibility, response inhibition, planning and organization of behavior. Ex. 77 at p. 5 (Report of Dr. Kate Allen).

explanations of how this defendant traveled the road to criminal behavior.

Ex. 77 at p. 3, 8 (Report of Dr. Kate Allen).

Dangerous chemicals found in pesticides had similar adverse effects on Robinson. According to Dr. Max Meisch of the University of Arkansas, the two most common pesticides used in Arkansas to control mosquitos were Malathion and Fenthion, both of which are highly toxic and known to affect the human nervous system.[15] Groves RL, Dame DA, Meek CL, Meisch MV, *Efficacy of three synthetic pyrethroids against three mosquito species in Arkansas and Louisiana*, J Am Mosq Control Assoc. Jun;13(2):184-8 (1997). Because both are organophosphates, exposure to them can have a profound effect on a human's ability to control his aggression. They can cause learning disabilities in math and reading, short-term memory damage, language and speech difficulties, aggression, irritability, depression and increased emotionality. Repeated exposure can impair the memory and concentration, and can result in depression and irritability as well as speech difficulties. Ex. 2 (Statement Dr. Stephen K. Martin).

Dr. Stephen Martin, a neuropsychologist, evaluated Robinson and concluded that he suffered from "subtle cognitive deficits" and "general learning disabilities," consistent with chronic exposure to organophosphate pesticides. Ex. 2 at p. 3 (Statement of Dr. Stephen K. Martin). Such exposure "can have negative behavioral effects involving learning capacity as well as other cognitive abilities." Ex. 2 at p. 3 (Statement of Dr. Stephen K. Martin). Martin also found

---

[15] According to a 1983 report on the use of pesticides in Arkansas soybean production, a number of chemicals were applied both prior to plant emergence and before harvest.

correlations to Robinson's fetal alcohol and drug exposure. Exhibit 64 (Supplemental Martin Declaration).

Finally, experts could have explained how Robinson's background affected his actions as an adult. According to Dr. Cunningham, the type of neglect that Robinson suffered has been linked to "psychological disorders, behavior disturbances, and violent and criminal conduct." Ex.1 at p. 49 (Decl. of Mark Cunningham). "[N]eglect has been identified as more psychologically and developmentally damaging than physical abuse." Ex. 1 at p. 49; *see* Ex. 30 at ¶ 16 (Decl. of Marcus Jwain Robinson (describing the anger he felt from his mother's abandonment)). Dr. Allen agreed:

> The "laying down" of attachment during infancy is, profoundly, the basis of emotional and behavioral self-control that begins in the toddler years and remains rather set (without effective intervention) into adulthood.
>
> * * *
>
> If a child is negatively impacted by being overchallenged in the fetal period, he is not ready to cope with and grow through the challenges of the human environment after birth. In such a case, an unusually attentive and stable maternal response is necessary in order to compensate for the lagging "hardware." This was not the mothering Robinson received.

Ex. 77 at pp. 8-9 (Report of Dr. Kate Allen (internal citations omitted)).

33

## C.    Government's Opposition

In its opposition to Robinson's 2255 motion, the Government twice conceded that the district court should hold an evidentiary hearing "[b]ecause there are factual disputes raised by the pleadings on the [IAC claims]." Response at p. 90 (Dkt. 2365); Supp. Resp. at p. 10 (Dkt. 2439).

Attached to the Government's response were declarations from Ball, Strickland, and Cummings. Trial counsel tried to justify a number of deficiencies based upon strategy. Resp. Ex. A (Aff. of Wessley T. Ball, at pp. 2 ("strategy"), 6 ("strategy"), 8 ("strategic choices"), 10 ("strategy"), 13 ("strategy")). Ball did not confine his declaration to a recitation of historical facts relevant to deciding the motion; he analyzed legal principles and offered his opinion why each of Robinson's ineffective-assistance-of-counsel claims should fail. *See generally* Resp. Ex. A. Strickland went even further declaring, "Like Mr. Ball, I dispute all of Robinson's claims with the single exception that there arose a breakdown in the attorney-client relationship during the appeal of this case." Response Ex. B. at p. 2. Strickland also professed that he "greatly resent[s]" habeas counsel for "casually slandering the efforts and reputations of lawyers who labor in the trenches." *Id.* at p. 8.

## D.    District Court Denial

Notwithstanding Robinson's repeated requests and the Government's repeated concessions, the district court refused to conduct an evidentiary hearing on Robinson's IAC claims. Memorandum Opinion and Order, pp. 45-46. ("Mem. Op.") (attached hereto as Appendix A).

In issuing its opinion denying the petition, the district court ignored or excused trial counsel's failure to investigate. In addition, the district discredited

34

all of the evidence presented in post-conviction and found that none of it was sufficient to prove prejudice.

In addressing the failure of trial counsel to investigate and rebut the prosecution's aggravating evidence, the district court essentially found that trial counsel's actions were reasonable because the rebuttal evidence was not sufficiently persuasive. Mem Op. p. 18-22. Regarding the alleged 'hit' on Williams, the district court glossed over the fact that both trial counsel admited they never investigated the incident. Instead, the trial court focused on whether "trial counsel acted unreasonably in the way that they handled the prosecution's evidence." Mem. Op. p. 20. Finding that Robinson had failed to prove the "falsity" of Henderson's testimony, the district court concluded that trial counsel were not deficient. *Id.* In finding the absence of prejudice, the district court also speculated that the jury "did not believe the future dangerousness factor was sufficient to justify a sentence of death." *Id.*

In similar fashion, the district court excused trial counsel's failure to investigate the deadly-conduct conviction. The court found that the police reports corroborated the charge of attempted murder, that Tucker testified that she did not duck down until after the shooting started, and the driver of the Robinson car, Smart, had questionable credibility because he had originally denied the offense to the police. Mem. Op. at p. 21-22. Thus, according to the district court, because the new evidence did not definitively prove Robinson's innocence, trial counsel was not ineffective for failing to discover it. *Id.* at 22.

On the issue of the lack of Robinson's participation in gangs, the district court found trial counsel's explanation, that gang evidence was frightening, to be a

35

reasonable strategy for failing to rebut the prosecution's evidence. Mem. Op. at p. 27.

The district court also found that trial counsel was not deficient regarding mitigating evidence. The lower court rejected the argument of counsel's failure to a mitigation specialist because there was no absolute right to such an investigator and trial counsel made "a strategic decision not to obtain a mitigation specialist given the information they knew about their client and the evidence against him." *Id.* at 22-23.

Regarding the failure to conduct a life history investigation, the district court discounted all of the life history declarations and records, finding it cumulative of the testimony given by Robinson's uncle and mother. *Id* at 27.

On the failure to investigate mental health issues, the district court concluded that "there was [no] reason for them to [go further] given the information" they already knew. *Id* at 25. Even though trial counsel were aware that Robinson was held back in the third grade and was transferred to an alternative high school, the district court concluded that because Robinson eventually graduated and later attended some computer classes, their investigation was reasonable. Concerning Robinson's pesticide exposure, the district court found no prejudice because the evidence was not relevant to "Robinson's ability to plan and implement the murder of three individuals." *Id.* at 26. Further, regarding Robinson's fetal alcohol exposure, the district court found no prejudice because experts did not opine "that Robinson suffered so much and was so damaged by his mother's conduct that he is less culpable for the murder of three people." *Id.* at 26. And even though trial counsel was unaware of Robinson's cognitive impairments because they failed to conduct any investigation in this area, the district court

credited trial counsel's "strategic decision not to portray him as a person with mental deficiencies . . . [as] a reasonable one." *Id.*

## LEGAL STANDARD

A Certificate of Appealability (COA) must be granted if the petitioner makes "a substantial showing of the denial of a constitutional right." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see also* 28 U.S.C. § 2253(c)(2) (2009). In making this determination, courts conduct only a "threshold inquiry" and "need not decide the ultimate merits of the underlying issue in the petitioner's favor." *Jackson v. Dretke*, 450 F.3d 614, 616 (5th Cir. 2006). A COA must issue if "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336. "A claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir. 2009); *see e.g.*, *Skinner v. Quarterman*, 528 F.3d 336, 340-341 (5th Cir. 2008)(granting a COA for ineffective-assistance-of-counsel claim despite recognition that proof of prejudice would require "considerable speculation"); *see also Epps v. Thaler*, No. 08-70050, 2009 U.S. App. LEXIS 20098 (5th Cir. Sept. 9, 2009) (granting COA for review of ineffective-assistance-of-counsel claim for failure to investigate childhood physical abuse even though state court held there was neither deficient performance or prejudice). "[A]ny doubt as to whether a COA should issue in a death-penalty case must be resolved in favor of the petitioner." *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 1992); *Blanton v. Quarterman*, 287 Fed. Appx. 407, 409 (5th Cir. 2008) ("Resolving doubt in favor of Blanton in this death penalty

case, and based on our limited, threshold inquiry concerning the merit of Blanton's claim, we find this claim adequate to deserve encouragement to proceed further.").

## ARGUMENT

I. **Reasonable Jurists Would Certainly Debate, If Not Disagree With the District Court's Summary Denial of Robinson's Ineffective Assistance of Counsel Claims**

In order to establish ineffective assistance of counsel (IAC), a petitioner must satisfy the familiar two-prong test: (1) deficient performance and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

First, the district court applied the wrong analytical construct for evaluating trial counsel's deficient performance. Contrary to the lower court's view, Robinson faulted his attorneys, not for failing to present certain evidence, but for completely abdicating their responsibility to investigate prior to the penalty phase. *See* Memorandum and Order ,p. 23. (characterizing the IAC claim as "a failure to present sufficient mitigating evidence."). "When a petitioner argues that his attorney failed to adequately investigate mitigation evidence, the proper inquiry is 'not whether counsel should have presented a mitigation case, . . . [but] whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable.'" *Galloway v. Thaler*, No. 08-70050, 2009 U.S. App. LEXIS 20098 (5th Cir. Sept. 9, 2009) (*quoting Wiggins v. Smith*, 539 U.S. 510, 523 (2003)). Rather than scrutinize trial counsel's investigatory failure, however, the district court erroneously focused on whether trial counsel unreasonably failed to present particular evidence. Mem. Op. at p. 20 ("they [do not] establish that Robinson's trial counsel acted unreasonably in the way that they handled the prosecution's evidence at trial.");

*Id.* at p. 19-20 (" The Court agrees with the Government that these statements do not mesh well. . . ."). Although trial counsel essentially conceded they were unaware of most of the evidence presented in the habeas proceedings, the district court absolved their dereliction by finding the evidence unpersuasive. But the strength of the evidence is simply irrelevant to the deficient performance analysis where, as here, trial counsel knew nothing about it.

Similarly, the trial court accepted trial counsel's claims of "strategy" as dispositive. *See, e.g.*, Mem. Op. at p. 25 ("his attorneys' strategic decision not to attempt to portray him as a person with mental deficiencies . . . was a reasonable one"). But a decision qualifies as strategic only if it is sufficiently informed. *United States v. Drones*, 218 F.3d 496, 500 (5th Cir. 2000) ("*Strickland* does not require . . . deference to decisions that are uninformed by an adequate investigation into the controlling facts and law." ); *Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003); *Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003) ("a decision cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose."). Moreover, courts must look to "'counsel's perspective at the time' investigative decisions are made." *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (*quoting Strickland*, 466 U.S. at 689). Because trial counsel were unaware of most of the information revealed in post-conviction proceedings, their purported tactics were nothing more than "post-hoc rationalizations." *Wiggins*, 539 U.S. at 527 ("the 'strategic decision' . . . invoke[d] to justify counsel's limited pursuit of mitigating evidence resembles more a post-hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing.").

The district court also improperly supplied possible strategies where trial counsel were unable to proffer one. For example, the district court concluded trial counsel's decision not to conduct a mental health evaluation was reasonable based upon a review of Robinson's school records, along with the interview of Rose. Mem. Op. at pp. 24-25. In reality, trial counsel failed to pursue mental health evaluations because they considered such evidence "psychobabble" or "laughable" - not because of any evidence gained through an investigation. Resp. Ex. A, at p. 6 (Decl. of Ball Declaration). Precedent makes clear that the revewing court may only evaluate trial counsel's *actual* reason. *Wiggins*, 539 U.S. at 527-28; *Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003); *see also Brown v Sternes*, 304 F.3d 671, 691-92 (7th Cir. 2002) ("it is not the role of a reviewing court to engage in a post hoc rationalization for an attorney's action by 'construct[ing] strategic defenses that counsel does not proffer.").

Finally, the district court refused to address the ineffectiveness allegations in the context of the Guidelines of the American Bar Association for the Performance of Counsel in Death Penalty Cases published in 1989. The Supreme Court has unequivocally held that counsel's performance is assessed by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *accord Sonnier v. Quarterman*, 476 F.3d 349, 358 n.3 (5th Cir. 2007); *Adams v. Quarterman,* 324 Fed. Appx. 340, 345 (5th Cir. 2009).

Various guidelines address trial counsel's representation in this case and the district court erred by rejecting them *sub silentio*. The Guidelines require counsel to conduct sufficient investigation "to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced

40

by the prosecutor." ABA Guidelines § 11.4.1(C); *see also* § 11.8.6. In furtherance of that end, the Guidelines require defense counsel to retain a mitigation specialist as part of the capital defense team. Updated Guidelines § 4.1. Trial counsel are also required to employ a professional "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." (Updated Guideline § 4.1.A.2 cmt.).[16]

Second, the lower court's prejudice analysis was fundamentally flawed. First, the Court chose to evaluate each claim seriatim and analyze the prejudice of each individually. But "in assessing whether [Robinson] was prejudiced by trial counsel's conduct, the court should 'reweigh the evidence in aggravation against the totality of the available mitigating evidence.'" *Smith v. Dretke*, 422 F.3d 269, 284 (5th Cir. 2005) (*quoting Wiggins*, at 534).

The district court also incorrectly evaluated prejudice resulting from the individual evidence. For example, the district court discounted the rebuttal aggravating evidence because it did not conclusively prove the falsity of the

---

[16] In refusing to find trial counsel deficient for failure to retain a mitigation specialist, the district court also mischaracterized Robinson's claim. Contrary to the lower court's suggestion, Robinson did not claim that the "Constitution . . . provide[s] . . . an absolute right to the services of a mitigation specialist." Instead, Robinson claimed that trial counsel's failure to hire a mitigation specialist fell below prevailing norms. The failure to retain such a specialist is often cited as a part of trial counsel's failure to conduct a thorough mitigation investigation. *See., e.g., Walbey v Quarterman*, 2009 U.S. App. LEXIS 942, *11 (5th Cir. Jan. 19, 2009) ("[T]here is little room for debate that the district court was correct to agree . . . that [trial counsel'] investigation of a potential mitigation defense was deficient," in part for the failure to hire a mitigation expert); *see also United States v. Hall*, 455 F.3d 508, 517 (5th Cir. 2006) (finding trial counsel did not provide deficient performance in part based upon the hiring of a mitigation specialist).

41

prosecution's allegations. Mem. Opp. at 20, 26. This is too high of a standard. To establish prejudice, a petitioner need only raise "a reasonable probability that one juror would have voted for life in prison rather than death." *Walbey v. Quarterman*, 309 Fed. Appx. 795, 806 (5th Cir. Jan. 19, 2009) (*quoting Wiggins*, 539 U.S. at 537).

In addition, the district court purports to divine the jury's intent by claiming that the jury did not rely on the future-dangerousness finding in reaching a death penalty verdict. Not only is such rank speculation wholly improper, it direct conflicts with this Court's holding. *United States v. Robinson*, 367 F.3d 278, 292 (5th Cir. 2004) ("The jury's sentencing recommendation was based in part on . . . Robinson's criminal history."). Moreover, the district court relied on the dubious assumption that because "the facts supporting future dangerousness applied to all offenses for which Robinson was tried" and "the jury did not impose the death penalty for the Resendez murder," the jury "did not believe the future dangerousness factor was sufficient to justify a sentence of death." Mem. Op. at p. 20. The more likely inference is that the jury limited its consideration of the death penalty to only those murders where it was shown Robinson was personally involved, thus, excluding the Resendez murder from capital consideration.

The district court's examination of the mitigation evidence is equally fallacious. In rejecting the mental health evidence, the district court found that there was an insufficient connection between Robinson's crimes and his cognitive impairments to constitute mitigation. Mem. Op. at p. 26 (rejecting mental health evidence because there was no opinion that it "affect[ed] Robinson's ability to plan and implement the murder of three individuals."); *Id.* ("expert would [not] have persuaded the jury that Robinson suffered so much and was so damaged by

his mother's conduct that he is less culpable for the murder of three people."). But the district court's reasoning is simply a reprise of the long-defunct "nexus" test. *Nelson v. Quarterman*, 472 F.3d 287, 303 (5th Cir. 2006); *Tennard v. Dretke*, 542 U.S. 274 (2004) (precluding limitation on jury's consideration of mitigating information to only evidence that has a "nexus" to the crime). "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 398 (2000).

Finally, the district court erroneously concludes that because trial counsel presented "some" mitigating evidence, no prejudice can ensue no matter how compelling the omitted information may be. Mem. & Op. at p. 31 (finding no prejudice based upon the fact that trial counsel called "five prison officials who testified about Robinson's good behavior and positive adjustment to life in prison and presented "high-school football coaches and teachers as well as one of his teammates."). In the same vein, the district court rejected the mountain evidence regarding Robinson's tragic background as "cumulative" of the skeletal testimony provided by Robinson's mother and distant uncle. Even though the defense provided an inaccurate portrayal of Robinson's upbringing, the district court still held that prejudice cannot be established. Mem. Op. at p. 31 ("Even if the new declarations provide evidence that his home life may have been less positive than was portrayed at trial and that he had some difficulty with school, that evidence does not demonstrate prejudice.").

The district court is simply wrong. "[C]ounsel can be prejudicially ineffective even if some of the available mitigation evidence is presented. . . [P]rejudice is still possible if that evidence is substantially incomplete." *Walbey v*

*Quatermann*, No. 08-70007, 2009 U.S. App. LEXIS 942 (5th Cir. 2009); *Gray v Branker*, 529 F.3d 220, 236-38 (4th Cir. 2008) (finding ineffective assistance based upon failure to investigate mitigating evidence because the omitted information "would have given the jury the full picture of Gray and his crime"); *Williams v Allen*, 542 F.3d 1326, 1342 (11th Cir. 2008) (finding prejudice because "the mitigation evidence that Williams' trial counsel failed to discover paints a vastly different picture of his background than that created by [his mother's] abbreviated testimony."); *Outten v Kearney*, 464 F.3d 401, 421, 422 (3rd Cir. 2006) ("[s]imply because some mitigating evidence regarding Outten's abusive childhood was introduced to the jury. . . it does not follow that the jury was provided a comprehensive understanding of Outten's abusive relationship with his father or other aspects of his troubled childhood."). There is no question that trial counsel's presentation, consisting of the abbreviated testimony of a few family members, and the testimony of prison guards and football personnel who barely knew Robinson, paled in comparison to the compelling evidence presented here.

Given the stark difference between the actual penalty-phase presentation and the evidence presented in post-conviction, reasonable jurists could debate the district court's ultimate conclusion regarding prejudice. To counter the prosecution's evidence in aggravation, trial counsel could have provided direct testimony to rebut the claim that Robinson ordered a hit against "One Love" Williams. Competent counsel would have also discounted, if not excluded, the dubious claim that Robinson was affiliated with a notorious street gang. Robinson's attorneys could have also shown that his prior conviction for deadly conduct was minor and that he fired shots at what he believed to be an empty truck. Regarding the case in mitigation, reasonable counsel would have

44

discovered and offered strong evidence of Robinson's troubled background and refrained from presenting a false portrayal of Robinson as someone who enjoyed a normal upbringing. Moreover, trial counsel would have shown that Robinson suffered brain damage as a result of his mother drinking alcohol throughout her pregnancy and from his constant exposure to toxic pesticides during his childhood. Given that all of the jurors found Robinson was a future danger and none of the jurors found Robinson's background mitigating, there is at a reasonable probability that one juror would have voted for life.

## II. The District Court's Refusal to Grant an Evidentiary Hearing Warrants Automatic Reversal

Not only did the district court reach the wrong conclusion, the result was based upon a flawed process. Without listening to a single witness, the district court made credibility determinations, weighed competing evidence - it even assumed facts never introduced. Because the trial record did not establish, much less conclusively establish, that Robinson was entitled to no relief, the district court was obligated to conduct an evidentiary hearing. The district court's refusal to hold a hearing - despite the Government's concession that one was necessary - amounted to a clear abuse of discretion.

Unlike state prisoners, federal habeas petitioners enjoy a presumption in favor of an evidentiary hearing: "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court *shall* . . . grant a prompt hearing thereon." 28 U.S.C. § 2255(b) (2009) (emphasis added); *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992); *United States v. Briggs*, 939 F.2d 222, 228-29 & n.19 (5th Cir. 1991). An evidentiary hearing is required where the petitioner presents "independent indicia of the likely

merit of [his] allegations." *United States v. Cavitt*, 550 F.3d 430, 442 (5th Cir. 2008); *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006). Where the habeas claim relates to "purported occurrences outside the courtroom," the trial record "casts no light." *Machibroda v. United States*, 368 U.S. 487, 495 (1962) (explaining record refers only to "'files and records' in the trial court."). Moreover, "[c]ontested factual issues may not be decided on the basis of affidavits alone unless the affidavits are supported by other evidence in the record." *Tucker v. United States*, 275 Fed. Appx. 402, 404 (5th Cir. 2008); *United States v. Hughes*, 635 F.2d 449, 451 (5th Cir. 1981). Thus, where the evidence is in conflict, a district court abuses its discretion in denying an evidentiary hearing. *Matthews v. United States*, 533 F.2d 900 (5th Cir. 1976) (reversing and remanding the denial of 2255 motion for an evidentiary hearing because the district court was faced with "conflicting affidavits"); *Pike v. United States*, 409 F.2d 499, 501 (5th Cir. 1969) ("Where the allegations in a § 2255 motion would entitle the petitioner to relief and the files and records of the trial court are inconclusive, findings of controverted issues of material fact must be made on the basis of an evidentiary hearing, not on the basis of pleadings and affidavits.").

This Court, consistent with the majority of other circuits, has stressed the need for an evidentiary hearing to resolve IAC claims raised in 2255 proceedings. *United States v. Hayes*, 532 F.3d 349, 355 (5th Cir. 2008) (remanding for an evidentiary hearing because the court "would be engaging in speculation, preventing adequate review of the district court's judgment as to whether defense counsel performed unreasonably under Strickland."); *United States v. Culverhouse*, 507 F.3d 888, 898 (5th Cir. 2007) (remanding matter to district court for evidentiary hearing, noting that "[w]ithout any evidence as to counsel's

strategy, we refuse to make hindsight guesses on the matter"); *Friedman v. United States*, 588 F.2d 1010, 1017 (5th Cir. 1979) ("The point is that we do not know, nor does the District Court know, whether [petitioner] was unconstitutionally deprived of . . . effective assistance of counsel. The hearing is the thing.").[17]

Here, there is no question that the district court abused its discretion in denying Robinson a hearing. Among the numerous factual disputes, the primary conflict arose regarding whether and to what extent trial counsel conducted a reasonable investigation. In response to Robinson's allegation that trial counsel failed to conduct an adequate investigation, trial counsel attempted to justify their dereliction based upon "strategic" determinations. Nothing in either the trial transcript or even trial counsel's own files corroborated these assertions. Nevertheless, the district court simply adopted trial counsel's uncorroborated hearsay assertions as the truth. *See., e.g.*, Mem. Op. at pp. 27-28 (finding trial counsel decided not to present rebuttal gang evidence as "strategic"); *Id.* at p. 26 ("[H]is attorneys' strategic decision not to attempt to portray him as a person with mental deficiencies sufficient to mitigate the murderous behavior he engaged in was a reasonable one."). This was unquestionably error.

The district court compounded the problem by engaging in a number of other determinations that could only be made following an evidentiary hearing. Perhaps most egregious, district court made credibility findings of witnesses it had

---

[17] *See also Osagiede v. United States*, 543 F.3d 399, 408 (7th Cir. 2008) ("Ineffective assistance claims often require an evidentiary hearing because they frequently allege facts that the record does not fully disclose"); *United States v. Teague*, 953 F.2d 1525, 1534 n.11 (11th Cir. 1992) (en banc) ("ineffective assistance of counsel . . . claims usually require factual findings best made in an evidentiary hearing").

47

never heard from. *See, e.g.*, Mem. Op. at p 26 (rejecting statement that Robinson did not observe Tucker in the truck, finding witness's "credibility is questionable"); *see United States v. Nation*, 229 Fed. Appx. 288, 290 (5th Cir. 2007) (remanding for evidentiary hearing despite inconsistencies between the petitioner's claims and "some of his statements at the plea hearing"). The district court also reached factual conclusions based upon nothing more than the *ipse dixit* of Government counsel. *See, e.g.*, Mem Op. at p. 21 (agreeing with the government that Robinson's reduced plea to deadly conduct instead of attempted murder was a "commonplace [occurrence]" and do[es] not indicate that the factual basis of the original offense is incorrect"). Finally, the district court faulted Robinson for failing to definitively prove his allegations while denying him an opportunity to do so at a hearing. *See, e.g.*, Mem. Op. at p. 24 (rejecting allegation that trial counsel failed to communicate regularly based upon jail logs in part because "Robinson has not made any attempt to quantify the amount of time he spent talking with his attorneys over the telephone."); *Id.* at p. 20 (rejecting witness statements undermining prosecution's allegation that Robinson ordered a "hit" against Williams because they "do not establish the falsity of corroborating versions of events Williams and Henderson gave at Robinson's trial").

In sum, the district court's summary disposition of Robinson's habeas petition and its concomitant failure to grant an evidentiary hearing, constituted an abuse of discretion. To remedy the district court's clear error, the Court need not squander judicial resources by proceeding to the merits of Robinson's appeal. Instead, the Court should simply return the case below for an evidentiary hearing. This approach is entirely consistent with the Court's practice of remanding a potentially meritorious IAC claim for an evidentiary hearing as part of its COA

grant. *See, e.g., United States v. Beltran*, 278 Fed. Appx. 433, 435 (5th Cir. 2008) (granting COA and remanding for evidentiary hearing to address IAC claim based upon advice regarding entry of guilty plea); *Nation*, 229 Fed. Appx. at 290(same); *United States v. Johnson*, 278 Fed. Appx. 317, 318 (5th Cir. 2008) (granting COA and remanding for evidentiary hearing to address IAC claim that trial counsel failed to file a notice of appeal); *United States v. Ryan*, 215 Fed. Appx. 331, 332 (5th Cir. Jan. 29, 2007).

The Eighth Circuit's recent COA grant in *Nelson v. United States*, 297 Fed. Appx. 563 (8th Cir. Oct. 27, 2008) is instructive here. There, a capital 2255 petitioner alleged several IAC claims, including trial counsel's failure to conduct a mitigation investigation. The district court denied the petition without an evidentiary hearing even though the Government conceded that one was required. The Eight Circuit granted the COA and remanded, concluding that "a fair and just determination" of the IAC claims required a hearing.

## CONCLUSION

For the foregoing reasons, Robinson respectfully requests that the Court grant the COA on his ineffective assistance of counsel claims and remand for an evidentiary hearing.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

MICHAEL CHARLTON
Deputy Federal Public Defender

DATED: October 20, 2009          By _____
CRAIG A. HARBAUGH
Deputy Federal Public Defender

49

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1, I certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains 13,444 words.

DATED: October 20, 2009

CRAIG A. HARBAUGH

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202; that I am over the age of eighteen years; that I am not a party to the above-entitled action; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, and the United States Court of Appeals for the Fifth Circuit, at whose direction the service by United States Postal Service delivered described herein was made to:

SUSAN COWER
Assistant United States Attorney
United States Attorney's office
1100 Commerce Street, 3rd Floor
Dallas, TX 75242

A copy of: **APPLICATION FOR A CERTIFICATE OF APPEALABILITY**

This certification is executed on October 20, 2009, at Los Angeles, California.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dolores Coultas