CA No. 09-70020

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| JULIUS OMAR ROBINSON, | DC Nos.: |
| Defendant-Petitioner, | Civil No. 4:05-CV-756-Y |
| v. | Criminal No. 4:00-CR-00260-2 |
| UNITED STATES OF AMERICA, | **DEATH PENALTY** |
| Plaintiff-Respondent. | |

## APPENDIX A

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

HONORABLE TERRY MEANS
United States District Judge

SEAN K. KENNEDY
E-Mail: Sean_Kennedy@fd.org
Federal Public Defender
CRAIG HARBAUGH
E-Mail: Craig_Harbaugh@fd.org
Federal Public Defender
321 East 2nd Street
Los Angeles, California
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

MICHAEL CHARLTON,
Deputy Federal Public Defender
E-Mail: mike_charlton@fd.org
Federal Public Defender's Office
411 East Bonneville Avenue, Ste 250
Las Vegas, NV 89101-6632
Telephone: (702) 388-6577
Facsimile: (702) 388-6261

Attorneys for Defendant-Petitioner
JULIUS OMAR ROBINSON

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Julius Omar Robinson, | § | |
| *Petitioner,* | § | |
| | § | CIVIL NO. 4:05-CV-756-Y |
| V. | § | (Criminal No. 4:00-CR-260-Y-2) |
| | § | (death-penalty case) |
| United States of America, | § | |
| *Plaintiff-Respondent.* | § | |

## **FINAL JUDGMENT**

The Court having entered its Memorandum Opinion and Order to deny relief in this case, all

of the relief requested is hereby **DENIED**.

The Clerk shall transmit a true copy of this judgment, together with a true copy of the

Memorandum Opinion and Order, to the parties.

**SIGNED**: November 7, 2008.


*Terry R. Means*
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Julius Omar Robinson, | § | |
| *Petitioner,* | § | |
| | § | CIVIL NO. 4:05-CV-756-Y |
| V. | § | (Criminal No. 4:00-CR-260-Y-2) |
| | § | (death-penalty case) |
| United States of America, | § | |
| *Plaintiff-Respondent.* | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner Julius Omar Robinson is a federal prisoner under a death sentence who, having

been being convicted of capital murder in this Court, has filed a Motion to Vacate his conviction and

sentence under 28 U.S.C. § 2255. The Court denies Robinson's motion.

## I. PROCEDURAL HISTORY

A jury convicted Robinson of the murders of Johnny Lee Shelton and Juan Reyes and of

complicity in an ongoing criminal enterprise resulting in the death of a third person, Rudolfo

Resendez. After a subsequent punishment hearing, the jury, on March 28, 2002, recommended that

Robinson's punishment for the murders of Shelton and Reyes be death by lethal injection, and

recommended that life in prison be his punishment for the death of Resendez. This Court imposed

that sentence on June 5, 2002. On April 14, 2004, the United States Court of Appeals for the Fifth

Circuit affirmed Robinson's conviction and sentence on direct appeal. *See U.S. v. Robinson*, 367

F.3d 278 (5th Cir. 2004). The U.S. Supreme Court denied Robinson's petition for writ of certiorari

on November 29, 2004. *See Robinson v. U.S.*, 543 U.S. 1005 (2004).

Robinson filed the instant Motion to Vacate on November 29, 2005. (Doc. #2279.) The

government filed its response on April 28, 2006. (Doc. #2365.) Robinson filed a reply on August

28, 2006. (Doc. #2380.) On July 2, 2007, Robinson moved to amend his motion to vacate. (Doc. #2422.) This Court granted Robinson's motion in part and denied it in part, and Robinson filed a supplemental pleading on January 17, 2008. (Doc. #2432.) The government filed its response to Robinson's supplemental pleading on March 6, 2008 (Doc. # 2439), and Robinson filed his reply in support of his supplemental pleading on March 26, 2008 (Doc. #2443).

## II. **FACTUAL BACKGROUND**

### A. **Guilt/Innocence Phase**

The Fifth Circuit recited the following factual background in its opinion on direct appeal:

A.

Proving true to his Hollywood namesake, Robinson, also known by names such as "Scarface," entangled himself in a sadistic world of narcotics and violence in which he personally committed at least two senseless murders. In December 1998, Robinson – a wholesale drug dealer then operating in five states – killed a man he mistakenly believed responsible for an armed hijacking that cost him $30,000. In May 1999, angered by a fraudulent drug transaction in which he paid $17,000 for a block of wood covered in sheetrock, Robinson retaliated by killing a man whose only connection to the fraud was that he was the brother-in-law of the fraudulent seller.

For these murders and his complicity in an ongoing criminal enterprise resulting in the murder of a third man, Robinson was convicted and sentenced to death on three separate counts, to life imprisonment on two others, and to a consecutive 300-month sentence on another. With one limited exception, Robinson challenges neither the sufficiency nor the admissibility of the evidence.

B.

The murder of Johnny Lee Shelton is a case of mistaken identity. Shelton was similar in appearance to a man named "Big Friday," whom Robinson blamed for a hijacking in a McDonald's restaurant parking lot several months before. On the night he was murdered, Shelton and a friend, Jerell Gardner, spent the evening at a Dallas night club, where they were spotted by two of Robinson's associates who mistook Shelton for Big Friday and called Robinson to tell him what they had seen.

Robinson quickly arrived at the club, whereupon he and two other men sat in a nearby parking lot, waiting for the man they thought was Big Friday to leave. They

spotted Shelton and Gardner leaving the club in a car similar to the one Big Friday drove, and followed them onto a local highway. As they caught up to the car, Robinson yelled "that's him," leaned out the window, and opened fire with an AK-47 assault rifle. One of Robinson's companions, L.J. Britt, also known as "Capone," did the same. Although most of the bullets missed their mark, Shelton was struck in the stomach and later died.[FN1]

FN1. Those facts form part of the basis for Robinson's conviction and death sentence on counts 3 and 7, which charged violations of 21 U.S.C. § 848 and 18 U.S.C. § 924(j), respectively. The jury unanimously recommended a death sentence on both counts.

C.

Juan Reyes was shot to death at close range on the driveway in front of his home. He and two companions, Isaac Rodriguez and Nicholas Marques, arrived there on the day of the murder, not suspecting that in a car parked across the street were three men--including Robinson and Angelo Harris--who were upset that they had been sold a $17,000 block of wood instead of narcotics. Robinson and Harris approached Reyes carrying automatic weapons, said something to him--the record is unclear whether it was a demand for money--then shot him in the foot. Rodriguez, who had been standing nearby, turned to flee and was shot three times, in the back and leg.

Reyes fell to the ground and lay there as Robinson and Harris shot him at least nine times. An autopsy revealed fragments of concrete in several of Reyes wounds, suggesting he was shot from a distance of less than five feet, causing the bullets to pass through his body, ricochet off the pavement, and re-enter his back. Before leaving, Robinson and Harris also fired several shots at Marques, who was still seated behind the wheel in the car in which he, Reyes and Rodriguez had just arrived. Marques managed to drive around the corner to safety, but his car was riddled with bullets.[FN2]

FN2. Those facts form part of the basis for Robinson's conviction and death sentence on counts 3 and 11, which charged violations of 21 U.S.C. § 848 and 18 U.S.C. § 924(j), respectively. The jury unanimously recommended a death sentence on both counts.

D.

Robinson also was convicted for involvement in a broad conspiracy that led to the murder of Rudolfo Resendez at the hands of Britt and Hendrick Tunstall. While engaged in this conspiracy, Robinson and other conspirators possessed more than five kilograms of cocaine and various firearms.[FN3] Robinson was further convicted of possessing three firearms in furtherance of a drug trafficking crime: a 9mm UZI pistol, a .357 caliber Smith & Wesson pistol, and an SKS 7.62x39 semi-automatic assault rifle.[FN4] Finally, he was convicted on several other drug and weapons charges that the district court treated as lesser included offenses and for which no independent sentence was imposed.

FN3. Those facts form part of the basis for Robinson's conviction on count 3 and his conviction and life sentences on counts 12 and 15, which charged violations of 21 U.S.C. §§ 848 and 841(a)(1) and 18 U.S.C. § 924(j), respectively. The jury – having separately recommended a death sentence for the portions of count 3 relating to the Shelton and Reyes murders – unanimously recommended a life sentence on the portion of count 3 related to Resendez and two other life sentences on counts 12 and 15.

FN4. Those facts form the basis of Robinson's conviction and 300-month sentence on count 17, which charges a violation of 18 U.S.C. § 924(c)(1)(A).

*Robinson*, 367 F.3d at 282-283.

B.    Penalty Phase

In its opinion on direct appeal, the court of appeals observed the following about the penalty phase of Robinson's trial:

The jury's sentencing recommendation was based in part on (in addition to the aforementioned convictions) Robinson's criminal history. The jury learned of an incident in 1995 in which Robinson fired several shots from a handgun at a woman who had failed to pay him $120 for crack cocaine. This was used to show that Robinson had a violent record before the events charged in the indictment. The jury also was told of an incident, described in more detail in part IV, in which Robinson,

-4-

acting from his jail cell after his arrest in this case, arranged to have a government informant murdered. This was used to show that Robinson had a propensity to commit future acts of violence.

*Id.*, 367 F.3d at 283.

During the penalty phase of his trial, both sides introduced evidence from numerous witnesses regarding mitigation and future dangerousness.

### 1.    Prosecution's Case

In addition to the facts of the underlying convictions introduced during the guilt/innocence phase of Robinson's trial, the government also relied on evidence introduced through witnesses during the penalty phase of trial to bolster its position regarding Robinson's likelihood of future dangerousness.

#### a.    Attempted Murder of Sarah Tucker

As noted by the court of appeals, part of the evidence the jury relied on in making its sentencing decision was evidence introduced by the government that Robinson had attempted to kill a former high-school classmate, Sarah Michelle Tucker, because she did not pay him $120 that she owed him for crack cocaine. (R20/14-15, 17.) Tucker testified that Robinson fired several bullets into her truck while she was sitting in it parked in front of her parents' apartment. (*Id.*/17-19, 36-37.) Tucker also testified that Robinson shot bullets "through the walls and the windows" of her parents' apartment, and that bullets were found in her parents' couch as well as in a closet and in some toys that were in the closet. (*Id.*) Robinson ultimately was convicted of the Texas offense of deadly conduct and was sentenced on March 11, 1996, to five years' probation. (GX 295.)

### b.    The "Hit" Ordered on Michael Williams, a/k/a "One Love"

The government bolstered its position on future dangerousness by introducing evidence about a "hit" Robinson allegedly ordered on the life of Michael Williams, also known as "One Love," while in prison awaiting his murder trial because Robinson believed Williams was "snitching" on him. Williams, like Robinson, was born and raised in Dermott, Arkansas. (R17/183-84.) Williams was a drug dealer who had purchased cocaine and marijuana from Robinson. (*Id./*186.) During the investigation of Robinson's case, Williams testified against Robinson before the grand jury and also gave information to the Drug Enforcement Agency. (R20/94-96.)

Nathan Henderson, one of Robinson's co-defendants, testified at Robinson's trial that while he and Robinson were in prison together, Robinson told Henderson that Williams was "arrested on another case, and he was just telling on everybody trying to get his time down." (R20/114.) Henderson further testified that Robinson told him that he hoped somebody would "get" Williams. (*Id.*) On December 28, 2000, Robinson called his brother, Marcus, who set up a three-way call with Robinson's aunt, Josephine Dotson. During that phone call, Robinson told his aunt, "That dude One Love, man that dude right there go hard, Joe." Robinson later told Henderson that the "youngsters" in Dermott "got" One Love, dragging him behind a car. (*Id./*113-16, 130; GX 929a.)

Also during Robinson's trial, Williams testified that he was accosted by three men, one of whom pointed a .38 long-barrelled pistol at him and got into his car, hitting him in the jaw with the gun. (*Id./*138-45.)   He identified the people who accosted him as "Cracker" or Kendal Pitts, "Black" or Keith Eddington, and "Little Wayne" or Wayne Jordan. (*Id./*140.) Williams testified that Pitts told Williams that they were going to kill him for snitching on Pitts's "OG" down in Texas. Henderson had already explained to the jury that an OG is "like a leader" in a gang, and that the

young gang members in Arkansas saw Robinson as an OG, calling him "Face" or "Scar Face." (*Id.*/116.) Williams testified that they searched him for money and that he told them that he could pay them what they were being paid to kill him. (*Id.*/143.) Ultimately, they went by Williams's grandparents' house, where Williams told them that only one of them could come in with him to get some money he had hidden there. At that point, Pitts and Williams went inside together. (*Id.*/142-43.) Williams testified that one of the young men told him that if he was dead they needed to make a phone call to Texas "around 3 o'clock" for their money. (*Id.*/148.) Williams testified that after a struggle between himself and Pitts in which Williams's grandfather and another man intervened, Pitts ran off. Thereafter, and that Williams contacted the local police and also tried to move his sentencing date forward so that he could get into police custody sooner. (*Id.*/143, 147.)

### 2.    Robinson's Defense

On Robinson's behalf, defense counsel presented numerous fact witnesses and an expert witness during the penalty phase. The first group of witnesses were fact witnesses who knew Robinson during his time at Arlington's Lamar High School, where he played football, and post-graduation, when he attended computer-training courses. The defense called Eddie Peach, the head football coach and athletic coordinator at Lamar High School in Arlington, who testified that Robinson had played football at Lamar for three years, and that he was "always polite," that he was well liked, and obedient, both on the field and in the classroom. (R21/2-6.) The defense also called another Lamar High School coach, football assistant coach and track coach Mike Nelson, who testified that Robinson had once turned in a wallet containing $120 cash that Robinson had found in the locker room, noting that Robinson had not taken the money. (*Id.*/43-45.) The defense also called Lamar coach and teacher Elvin Jones, who had known Robinson since coaching him on his

son's basketball team when Julius was in approximately the sixth grade. (*Id.*/47-48.) Jones testified that Robinson was "reasonably quiet," but "very respectful" to his coaches and teammates, and noted that Robinson had never given the coaches "any problem whatsoever," and that he "was always willing and excited about working." (*Id.*/49.) Jones further testified that Robinson was self-disciplined and could stay focused and accept responsibility. (*Id.*/51-52.) Lamar assistant coach David York also testified on Robinson's behalf, stating that he had worked closely with Robinson and that Robinson played hard, "was very coachable," was easy to get along with, and did not have confrontations with other players. (*Id.*/77, 79.) The final member of this group to testify was Landry Burdine, a teammate of Robinson at Lamar, who stated that Robinson's teammates liked playing with him and got along well with him and that he was a good friend to everyone. Burdine asked the jury, based on his knowledge of Robinson, to spare Robinson's life. (*Id.*/15-18.)

In addition to testimony from witnesses associated with Robinson through his tenure at Lamar High School, the jury heard testimony from Debbie Wesson, an employee of the CCI Training Center, the computer training school Robinson attended, who testified that Robinson attended classes at the school four nights a week, missing only twelve of the 212 hours scheduled for him before he was arrested in November 2000. (*Id.*/121, 126, 130.) She testified that Robinson was succeeding at his course work which was intended to lead to certification as a Microsoft Certified Systems Engineer. (*Id.*/123-24.)

The defense also called numerous witnesses from the Federal Medical Center ("FMC") in Fort Worth, Texas, where Robinson was incarcerated before and during his trial, to testify on his behalf. The first to testify was FMC employee Stanley Gibson, who explained the prison structure to the jury and also testified that Robinson was "one of the better inmates [he had] seen in

-8-

administrative detention or in the housing units. . . . " (*Id.*/29.) Gibson stated that Robinson was courteous and respectful toward officers, counselors and inmates alike. (*Id.*/28-29.) Gibson also testified that Robinson was earnest and knowledgeable about the Bible, a topic that Gibson and Robinson had discussed. (*Id.*, 24-25, 28-31.)

The jury also heard testimony from Frederick Wagner, another FMC employee, who testified similarly about Robinson's behavior there, noting that Robinson was "respectful and quiet" and that he did "a lot of reading." (*Id.*/57-58, 64.) Another FMC employee, Stephen Sabolchick, testified that Robinson was a "cooperative inmate," and that he "followed the rules" of the prison. (*Id.*/71.) Frank Logan, leader of the FMC special housing unit day shift, testified that Robinson had "adjusted quite well" to life at FMC and stated that Robinson's behavior was "above average." (*Id.*/85.) Finally, Dan McCauley, the FMC jail-unit manager, testified on Robinson's behalf. McCauley had worked for the Federal Bureau of Prisons for 21 years and had been manager of the jail unit of the FMC since 1999. (R32/87-92.) McCauley explained the prison security measures as well as the type of work convicts are required to perform while incarcerated. (R21/119-20.) While McCauley testified on direct that Robinson had not had any disciplinary problems during his time at FMC, he admitted on cross-examination that Robinson had broken the prison's rules by participating in a three-way telephone call. (*Id.*/107-109.)

The defense also called two members of Robinson's family to testify on his behalf: his uncle, John Hollimon Jr., and his mother, Rose Hollimon. Robinson's uncle testified that Robinson's grandparents, although poor, had raised Robinson in a loving environment during his younger years and had made sure he and his brother went to school and church. (*Id.*/134-35, 138-39, 142, 151.) He further testified that his sister, Rose, had left her children with his parents when they

-9-

were young, but took them back to live with her in Arlington, Texas, during the boys' adolescent years. (*Id.*/140-42.) Hollimon also told the jury that while in Arlington, the boys lived in a dangerous environment and that Robinson was basically on his own and was forced to act as the man of the house. (*Id.*/142-44.) He also testified that Robinson was excited about the computer course he was taking and how he had explained to Hollimon that he wanted to open his own marketing business. (*Id.*/144-45.) Hollimon further testified that Robinson was respectful to his family and grandparents and mentioned that Robinson had sent his grandparents money when they needed it. (*Id.*/146-47.) Robinson's uncle also asked the jury to spare his nephew's life. (*Id.*/148-49.)

Next, Robinson's mother, Rose Hollimon, testified on her son's behalf, stating that she had married his father when she was only 15 and that she was forced to take care of her two children when her husband left her, which occurred when the brothers were four and five years old. (*Id.*/156, 159, 160, 162.) She testified that she thought she was doing the best thing for her children by leaving them with their grandparents to raise them when they were young. (*Id.*/156, 160, 162.) She swore that after she moved the boys with her to Texas, she continued to drink too much alcohol and smoke crack-laced marijuana joints. (*Id.*/167-68.) She described Robinson as an average student who made Bs and some Cs in high school and said he attended Tyler Junior College for a short time on a football scholarship. (*Id.*/164-65.)

Finally, the defense called expert witness Dr. Mark Cunningham, a board-certified forensic psychologist, who testified as a 'teaching witness' rather than a witness specifically evaluating Robinson as an individual, regarding risk assessment of future dangerousness. (R22/22, 26-30.) Cunningham testified about the likelihood of violence in a prison setting because Robinson would not be released with the sentencing options he had. (*Id.*/41.) According to Cunningham, research

indicates that violence in the community, severity of current offenses and severity of prior offenses are not good predictors of violence in prison. (*Id.*/41-42, 66.) He testified that, based on a study of 533 inmates commuted from death sentences that had been imposed before the decision in *Furman v. Georgia*, 408 U.S. 238 (1972), there were low rates of serious violence. (R22/50-52, 56-57.) Cunningham attributed the low rates to the structure of the prison community, including such factors as less access to weapons and drugs, intensive supervision, and inmates' informing on one another, as well as the fact that inmates knew that losing privileges because of bad behavior would make their prison time less bearable. (*Id.*/53, 60-62.)

Cunningham also reviewed other studies demonstrating low rates of violent behavior by those with death sentences commuted to life in prison and by those who had been convicted of capital sentences but not sentenced to death, noting that in one study only 1% of inmates in each group killed another inmate. (R22/62-64.) Ultimately, Cunningham concluded that there is a 20-30% chance that a capital inmate will be involved in serious violence in prison, a 70-80% chance he will not, a 10% chance of repetitive violence, and about a 1% chance that he will commit murder in prison. (*Id.*/64.) Cunningham concluded by describing the Bureau of Prisons's classification system, and explaining the arrangements made for the safety of inmates and staff. (*Id.*/70-72, 75-79.) The defense also submitted an exhibit from the Bureau of Prisons reflecting the judgment of psychologists there that Robinson presented a low risk of causing harm to others. (*Id.*/10-11; DX 2.)

The government called another witness, Peter M. Carlson, who provided further description of the various security levels in prison. (*Id.*/108-11.) Carlson, an associate professor at Christopher Newport University, spent 32 years in corrections, thirty of which were spent with the Federal

Bureau of Prisons. (*Id.*/106.) Carlson opined that the two main predictors of prison violence were past violence and young age (*Id.*/108-112.) Finally, he noted that, in the type of facility in which Robinson would likely be housed, he would spend a lot of time interacting with the other inmates and staff and would have access to telephones. (*Id.*/115-17.)

Finally, the parties introduced a stipulation stating that there were a number of people involved in the conspiracy as to whom the government did not intend to seek the death penalty, including Nathan Henderson, Jason Gehring, Angelo Harris, and several persons involved in the Resendez murder.

### III. STANDARD OF REVIEW

Title 28, United States Code section 2255 provides that a federal prisoner may move the convicting court to vacate, set aside, or correct a conviction or sentence based on its being imposed in violation of the Constitution or the laws of the United States. *See* 28 U.S.C. § 2255. A petition under § 2255 "may not do service for an appeal," and it is presumed that a defendant stands fairly and finally convicted. *United States v. Shaid,* 937 F.2d 228, 231-32 (5th Cir.1991) (en banc), *citing United States v. Frady,* 456 U.S. 152, 164 (1982). Therefore a defendant may not raise even constitutional or jurisdictional issues for the first time on collateral appeal without establishing both cause for failing to raise the issue on direct appeal and actual prejudice resulting from the failure. *Id.* A defendant must meet this cause-and-prejudice standard even where he alleges a fundamental constitutional error. *Id., citing Murray v. Carrier,* 477 U.S. 478, 493 (1986). Other types of error may be raised for the first time under § 2255 only if the defendant establishes that the error could not have been raised on direct appeal *and,* if the error were condoned, it would result in a complete miscarriage of justice. *United States v. Pierce,* 959 F.2d 1297, 1301 (5th Cir.1992).

-12-

Moreover, claims that were also raised, and rejected, on direct appeal are also barred from federal habeas review. *United States v. Rocha,* 109 F.3d 225, 229 (5th Cir. 1997). A federal habeas petitioner cannot, however, be expected to have raised a claim based on a Supreme Court case before that case was handed down. *Id.* Furthermore, suffering ineffective assistance of counsel on appeal does satisfy the cause-and-prejudice standard. *Id.* And, finally, the Supreme Court has recently held that claims that counsel was ineffective at trial can be raised on habeas review under § 2255 regardless of whether or not the claims were previously raised on direct appeal. *See United States v. Massaro,* 538 U.S. 500 (2003).

## IV. ISSUES PRESENTED

In his motion to vacate, Robinson raises a number of issues in various claims for relief. The Court construes those claims as follows:

A. The Court should vacate the death sentence based his having received ineffective assistance of counsel ("Ground I").

B. The Court should vacate Robinson's convictions because they were obtained in violation of Robinson's equal-protection rights ("Ground II").

C. The Court should vacate Robinson's convictions because the federal death-penalty act, as applied in Texas, violates Robinson's equal-protection rights ("Ground III").

D. The Court should vacate Robinson's convictions because Robinson received ineffective assistance of appellate counsel ("Ground IV").

E. The Court should vacate Robinson's convictions because the prosecution pursued fundamentally inconsistent theories at seriatim capital trials ("Ground V").

F. The Court should vacate Robinson's convictions because the prosecution knowingly used false and misleading testimony to secure Robinson's death sentence ("Ground VI").

See Mot. to Vacate (Doc. #2279.) Each of these grounds will be discussed separately below.

-13-

## A.    Ineffective-Assistance-of-Counsel Claims – Ground I.

Robinson claims that his trial counsel were ineffective in several respects. (Mot. to Vacate (Doc. #2279) at 17-53.) The Court will address each allegation of deficiency on the part of Robinson's trial counsel separately, but first the Court addresses Robinson's cursory assertion that the district court failed to adopt a plan that would insure high-quality representation, thereby prejudicing Robinson. (*Id.* at 11, 28.) Robinson alleges that "the Northern District of Texas has no plan that achieves the standards of the ABA; it requires only that counsel be qualified." The government argues that this claim, if indeed it is properly plead as such, is procedurally barred because Robinson did not raise it on direct appeal, thus barring the claim from collateral review. (Resp. Br. (Doc. #2365) at 27 (citing *Massaro, supra* at 504).) The Court agrees with the government. Robinson does not seek to establish that he raised such a claim on appeal, nor does he claim that his counsel should have raised such a claim on appeal and were ineffective for failing to do so. Robinson's claim therefore fails as a matter of law. *See Massaro*, 538 U.S. at 504.[1]

The Sixth Amendment to the United States Constitution provides criminal defendants a right to effective assistance of counsel during trial. *See* U.S. Const., art. VI. To successfully state a claim of ineffective assistance of counsel under Supreme Court precedent, a petitioner must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his

---

[1] The Court notes that the district's CJA plan, contained in Misc. Order No. 3, states that a capital defendant is entitled to two lawyers, at least one of whom must be knowledgeable in the law applicable to death-penalty cases. Additionally, the plan allows for appointment of additional counsel as "necessary for adequate representation." *Id.* at II.C.2.a. The plan also provides that the Court may appoint other professionals whose services are reasonably necessary to a defense, including investigators, technicians and paralegals. *See* http://www.txnd.uscourts.gov/publications/CJA-Dallas/Chapter7.html at § B.3. The district's plan also adopts the law set forth in 21 U.S.C. § 848(q)(4)(A) and (5), requiring, *inter alia*, that capital defense counsel have at least five years since being admitted to practice and three years' experience trying federal felonies. *Id.* at III.C.3. Moreover, the attorneys must have "demonstrated experience in, and knowledge of, the Federal Rules of Criminal Procedure, the Federal Rules of Evidence, the Sentencing Guidelines, the Bail Reform Act, and local criminal rules." *Id.* at Appendix I, Section III.A.2.

defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). A failure to establish either prong of this test requires a finding that counsel's performance was constitutionally effective. *Id.* at 696. To determine whether counsel's performance is constitutionally deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Id.* at 689. To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Robinson alleges several deficiencies on his trial counsel's part, including (1) failure to hire a skilled investigator, (2) failure to adequately investigate and rebut the government's evidence of the penalty-phase aggravating factor of future dangerousness; (3) failure to adequately investigate and present evidence of mitigation at the penalty phase, and (4) failure to properly make a Batson challenge to certain peremptory strikes made by the government during jury selection.

### 1.    Failure to Hire a Skilled Investigator

Robinson begins by making the unsupported assertion that his trial counsel did not employ the services of a skilled investigator. See Mot. to Vacate (Doc. #2279) at 28-29. Robinson's trial counsel employed the services of someone with whom they had worked on several previous occasions, David Bruce Cummings. (Resp. Br., (Doc. #2365), GX B, Affidavit of Jack B. Strickland ("Strickland Aff.").) According to the affidavit of Robinson's lead trial counsel, Jack Strickland, Cummings's work was known to them to be "first rate," and Strickland states that he has always been satisfied with his work. (*Id.*) In Cummings's own affidavit, the investigator explains that he has worked as a licensed investigator since 1989 and has been involved in "hundreds" of criminal-defense investigations, including numerous violent felonies and several capital-murder cases. (*Id.*,

GX C, Affidavit of David Bruce Cummings ("Cummings Aff.").)[2] According to Cummings, during the course of his investigation, he spoke directly with Robinson in order to help determine persons "who might make good fact witnesses for him." (*Id.*) Cummings then followed up the leads developed with Robinson by contacting those persons, including his football coaches at Arlington's Lamar High School, Dermott football coach Willie Parker, Robinson's computer course instructor at CCI, a number of prison guards who had supervised Robinson during his pretrial incarceration, and members of Robinson's family. (*Id.*) As set forth in the Court's discussion of the penalty phase, *supra*, Robinson's counsel subsequently presented testimony during the penalty phase from many of the individuals Robinson identified at his trial. In the face of the extensive investigation engaged in by Cummings on Robinson's behalf and the number of witnesses that that investigation produced at his trial, the Court concludes that Robinson has failed to demonstrate that his counsel's choice of investigator fell below an objectively reasonable professional standard. Moreover, Robinson has made no attempt to demonstrate that his counsel's choice of investigator prejudiced his case. Therefore, Robinson's claim that his counsel's choice of investigator deprived him of his right to effective counsel fails as a matter of law.

---

[2] The Court notes that while Robinson also asserts that investigator Cummings has a criminal history, this assertion is directly repudiated by a report filed as an exhibit to the government's pleading denoting the criminal history of another David Bruce Cummings, not the person employed by Robinson's trial counsel to investigate his case. (Resp. Brief (Doc. #2365), GX G, NCIC report on another David Bruce Cummings, filed under seal.)

### 2.    Failure to Adequately Investigate and Rebut the Government's Evidence of the Aggravating Factor of Future Dangerousness.

Robinson next alleges insufficiency of counsel based on his trial counsel's failure to sufficiently investigate or present evidence or to adequately investigate and rebut the government's aggravating evidence regarding future dangerousness. (Mot. to Vacate (Doc. # 2279) at 18-24.) Robinson analogizes the facts of his case to those in *Rompilla v. Beard*, 545 U.S. 374, 377 (2005). (Mot. to Vacate (Doc. #2279) at 17.) In *Rompilla*, the Supreme Court held that a "lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." The defense counsel in *Rompilla* failed to examine the police file on their client's prior conviction for rape and assault, which they knew the prosecution would use against their client in seeking the death penalty. The Court held that counsel's failure to review the file "fell below the line of reasonable practice" and also prejudiced their client because it was "uncontested they would have found . . . a range of mitigation leads that no other source had opened up," including information about Rompilla's childhood living in the slums, early incarcerations, dropping out of school, problems with alcohol, a likely mental-health disorder, and test scores demonstrating that Rompilla had "a third grade level of cognition after nine years of schooling." *Id.* at 390-91. The Court held that the "accumulated entries" in the prison records "would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense" that his counsel had acquired after conferring with some of his family members and from mental-health expert reports. The Court held that an investigation stemming from the file would likely have uncovered much of the information discovered post-conviction, including evidence that both of Rompilla's parents were alcoholics and that he was severely abused as a child, including being beaten and contained in a dog pen filled with

-17-

excrement." The Court concluded that the evidence taken as a whole bore no relation to the evidence presented by Rompilla's counsel at trial, which was made up of a "few naked pleas for mercy," and that Rompilla was prejudiced by its omission. *Id.* at 393.

### a.    Failure to Adequately Investigate and Rebut Evidence Regarding the Attempt on Michael "One Love" Williams's Life

Robinson first alleges that his trial counsel failed to investigate and properly rebut the government's evidence that Robinson was responsible for the attempted "hit" on Michael "One Love" Williams. (Mot. to Vacate (Doc. # 2279) at 18-24); cf Resp. Br. (Doc. #2365) at 49.) While Robinson acknowledges that his trial counsel moved *in limine* to exclude evidence that Robinson had "orchestrated" Williams's abduction, he claims that his trial counsel did not investigate the incident and thus had no means of rebutting the prosecution's claim that it would "link the kidnaping of Michael Williams to Robinson by virtue of Williams himself together with the testimony of investigating agents." (Mot. to Vacate (Doc. #2279) at 21; R20/10.) According to Robinson, because of his trial counsel's failure to investigate, his attorneys were unaware that, according to Robinson, "everybody involved in the incident, the victim and the perpetrators, denied any connection to a hit ordered by Julius Robinson." (*Id.*) Robinson relies now on the declaration of Michael Williams as well as the persons responsible for his attack, but Robinson does not address the trial testimony of Nathan Henderson that Henderson was told by Robinson that Robinson wanted someone to "get" Williams and that Robinson told Henderson about the attack after it occurred. Moreover, Williams's declaration does not totally contradict his trial court testimony, and each of his assailants has credibility issues as a result of their own criminal histories. (DX 34.)

Williams's own declaration states merely that he personally does not believe that Robinson ordered the assault, but he has not recanted his testimony that his attackers called him a snitch and

-18-

said they ought to kill him. (*Id.*) Next, Robinson relies on the declaration of Alquantis Pitts, the attacker Williams identified as calling him a snitch. (DX 28.) Pitts denies making the statement and states that it was instead Keith Edington who called Williams a snitch and said that Williams ought to be killed for it. Pitts claims that he only meant to steal from Williams and reclaim a shotgun he lost to Williams while gambling. Edington's declaration, on the other hand, states that Pitts had a different motive for the attack, claiming that Pitts had purchased some bad drugs from Williams and wanted a refund. (DX 8.) He does not mention the shotgun at all, even though according to Pitts the gun was handed to Edington and Jordan in the back of the car. (*Id.*.) Edington also denies Pitts's claim that they went to a bank and attempted to withdraw money from Williams's account. (*Id.*) Finally, Edington denies making any comment about killing Williams. But Edington states that he did not take any orders from Robinson. (*Id.*) Third, Wayne Jordan's declaration likewise corroborates Edington's story that the reason for going after Williams was because of the bad drugs he allegedly sold to Pitts. (DX 21.) In fact, Jordan goes so far as to state that having worked for Williams in the past, he knows that Williams sometimes would cheat buyers by selling them bad drugs. (*Id.*) Jordan includes a fact that no one else discussed in his declaration: that Williams and Pitts went off alone for some time after Williams offered to make good with new drugs or a refund. (*Id.*) Jordan denies hearing anyone discuss killing Williams and denies hearing any comment regarding Williams's snitching on Robinson. Jordan claims that he agreed to plead guilty because "it wasn't worth it to try to fight the case."

Robinson also provides a declaration from Louis Johnson, who claims that he was with Williams the day he was kidnaped and that Williams had sold bad cocaine the day before the assault to Pitts, Edington and Jordan. (DX 19.) Johnson states that the three assailants approached Johnson

and asked for their money back, which he relayed to Williams, who laughed. Johnson states that he and Williams were together later in the day when they were flagged down by Pitts, Edington, and Jordan, at which time Williams said to him, "Watch me sell them more cocaine." (*Id.*) At that point, Jordan claims that Pitts approached the car with a gun and demanded the assailants' money back. Johnson then got out of the car and did not hear any more. (*Id.*) He now admits that he told the FBI that he had not been in the car with Williams, but still claims he would have told everything to Robinson's trial counsel had they questioned him. (*Id.*)

The Court agrees with the government that these varying versions of events contained in the new declarations Robinson now relies upon do not mesh well, and certainly do not establish the falsity of corroborating versions of events Williams and Henderson gave at Robinson's trial. Nor do they establish that Robinson's trial counsel acted unreasonably in the way that they handled the prosecution's evidence at trial. Additionally, the jury's answers to the special verdict questions make it unlikely that the punishment assessed would have been different if the jury had been presented with these varied and contradicting new versions of events. While the facts supporting future dangerousness applied to all offenses for which Robinson was tried, the jury did not impose the death penalty for the Resendez murder, an indication that they did not believe the future-dangerousness factor was sufficient to justify a sentence of death for that crime. The Court concludes that Robinson has failed to establish that his trial counsel's performance was insufficient for failing to uncover and present the proffered evidence to the jury. Nor has Robinson established that he was prejudiced by any deficiency on the part of his counsel. Robinson's claim of insufficiency of counsel on this basis is therefore denied. *Cf. Rompilla*, 545 U.S. at 392-93.

> **b.    Failure to Adequately Investigate and Rebut the Government's Evidence Regarding the Alleged Attempted Murder of Sarah**

**Tucker.**

Robinson also claims that his trial counsel failed to adequately investigate and rebut the government's allegations that Robinson attempted to murder Sarah Tucker. (Supp. Pleading (Doc. #2432) at 9-11.) Although Robinson does not deny that he was convicted for his involvement in the shooting of Sarah Tucker's truck and her parents' apartment, Robinson claims that his actions were unfairly characterized by the government as attempted murder and that his trial counsel failed to adequately investigate and rebut the government's evidence. (*Id.*) According to Robinson, the court records pertaining to the offense establish that Tucker's truck had been parked for ten minutes and thus her vehicle would not have been in motion. (*Id.*) (citing DX 79, Tarrant County, Texas, court records re: Sarah Tucker incident, *State of Texas v. Julius O. Robinson*, Case No. 0574361D.) Robinson also points to the fact that the case was initially disposed of by accepting a plea to deadly conduct and ordering Robinson to supervised release. (*Id.*) Finally, Robinson criticizes his defense counsel for failing to investigate the driver of the car Robinson was in during the shooting, who is reflected in the police report as Richard Smart. (*Id.*) (citing DX 78 at 22.) Along with his supplemental pleading, Robinson includes a declaration from Smart explaining that he did not see anyone in Tucker's truck and, attempting to speak on behalf of himself and Robinson, states that "[w]e both believed the truck was empty." (*Id.*, DX 74, Decl. of Richard Smart at ¶3.)

The Court agrees, however, that Robinson's plea to "deadly conduct" is not persuasive, as pleas to lesser offenses are commonplace and do not indicate that the factual basis of the original offense is incorrect. See (Supp. Resp. (Doc. # 2439) at 2.) Additionally, the police reports corroborate the pre-plea charge of attempted murder. (DX 78.) Moreover, Tucker's testimony at trial was that she did not duck down into her vehicle until after Robinson began shooting. Finally,

Smart's credibility is questionable, since he has changed his statement from his original statement to police that he and Robinson were elsewhere when the shooting occurred. (*Id.* at 26.) In sum, the Court concludes that Robinson has failed to establish that his trial counsel's performance was insufficient for failing to uncover and present the proffered evidence to the jury. Nor has Robinson established that he was prejudiced by any deficiency on the part of his counsel. Thus, Robinson's claim of insufficiency of counsel on this basis is denied. *Cf. Rompilla*, 545 U.S. at 392-93.

**3.    Failure to Hire a Mitigation Expert or to Sufficiently Investigate Mitigation Factors.**

Robinson next claims that his trial counsel was constitutionally deficient for failure to conduct an adequate investigation of mitigation factors affecting the punishment phase of Robinson's trial, including failure to hire a mitigation expert. (Motion to Vacate (Doc. #2279) at 24-53.)

The Court will first address Robinson's claim that his trial counsel were deficient for failure to employ a mitigation expert. The Constitution does not provide Robinson with an absolute right to the services of a mitigation specialist. As the Fifth Circuit held in *Yohey v. Collins*, 985 F.2d 222 (5th Cir. 1993), an indigent defendant is only entitled to non-psychiatric experts if he has proven that the evidence is "both 'critical' to the conviction and subject to varying expert opinion." *Id.* At 227 (quoting *Scott v. Louisiana*, 934 F.2d 631, 633 (5th Cir. 1991) (citations omitted). The court agreed with the analysis of the Eleventh Circuit, concluding that "[a]n indigent defendant requesting non-psychiatric experts must demonstrate something more than a mere possibility of assistance from a requested expert." *Id.* (citing *Moore v. Kemp*, 809 F.2d 702, 712 (11th Cir. 1987)). According to the affidavits provided by Robinson's trial counsel, Wessley Ball and Jack Strickland, counsel made a strategic decision not to obtain a mitigation specialist given the information they knew about their

client and the evidence against him. (Resp. Br. (Doc. #2365), GX A-B, Aff. of Wessley T. Ball ("Ball Aff.") and Jack Strickland ("Strickland Aff.") Robinson has not demonstrated that his counsel's decision was anything but a reasonable strategy, and Robinson's supplemental pleading does not add any weight as he fails to cite any case law to support his argument. Nor has the Court discovered any in its own research.

In addition to their failure to hire a mitigation expert, Robinson claims that his trial counsel were insufficient for failing to adequately investigate or present evidence of several mitigation factors. He argues that his counsel were unreasonable in failing to discover and present to the jury evidence at the sentencing phase that would have caused the jury to return a verdict of life rather than death. See generally, (Mot. to Vacate (Doc. #2279) at 24-53.)

Under Fifth Circuit precedent, Robinson "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial" to prove that his counsel failed to conduct an adequate investigation. *See Lockett v. Anderson*, 230 F.3d 695, 713 (5th Cir. 2000) (quoting *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)). Trial counsel's decisions "are even less susceptible to judicial second-guessing" in cases such as Robinson's, where a defendant is not alleging a complete failure to present mitigating evidence, but rather a failure to present sufficient mitigating evidence. *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999).

It is clear from the trial record that Robinson's counsel introduced mitigation evidence from numerous witnesses. Essentially, Robinson faults his trial counsel on this point primarily for not presenting additional evidence at the punishment phase, including additional evidence of mental-health issues and additional evidence of negative childhood circumstances. In an effort to identify what an adequate investigation would have revealed, Robinson alleges that his counsel failed to

-23-

adequately investigate Robinson's mental state as well as his social history, including Robinson's life as a young child and teenager as well as alleged pesticide exposure and *in utero* exposure to dangerous substances. (Mot. to Vacate (Doc. #2279) at 28-87.)[3]

### a.    Failure to Adequately Investigate Mental State

In support of his claim that his counsel failed to adequately investigate his mental state, Robinson cites his trial counsel's failure to obtain his academic records and their failure to hire a mental-health expert to evaluate him. The record demonstrates, however, that Robinson's trial counsel reviewed his high-school records from Lamar High School in Arlington as well as his academic records from Tyler Junior College. Additionally, the record demonstrates that Robinson's trial counsel reviewed records from the computer school Robinson was attending at the time of his arrest. Finally, Robinson's mother testified that Robinson was an average student, earning Bs and some Cs. (R21/164-65.) All of this evidence demonstrates that Robinson was an average to above-average student in the years preceding the offenses for which he was convicted. (Resp. Br. (Doc. #2365), DX 37.)

Robinson criticizes his trial counsel's failure to review his lower-school records from Arkansas. Robinson has not demonstrated, however, that there was reason for them to do so given the information contained in his high-school and college records as well as the information provided

---

[3] Robinson also claims that his counsel was deficient for failing to communicate regularly with him prior to his trial. (Supp. Pleading (Doc. #2432) at 14.) Without citing any case law in support of his position, Robinson points to the jail visitation logs maintained by the FMC to demonstrate that his counsel was deficient because the logs show that Robinson's counsel met with him two times following their initial meeting and the investigator, Cummings, met with him once. (*Id.* at 15; DX 80, Bureau of Prison Records, at 2, 8.) The visitation logs, however, do not contain information regarding time spent between counsel and client at the courthouse for hearings or trial, nor do they contain any information about telephone calls between Robinson and his counsel; Robinson has not made any attempt to quantify the amount of time he spent talking with his attorneys over the telephone. The mere accusation of failure to communicate alone without sufficient documentation and a demonstrated effect of prejudice to Robinson's case is insufficient to establish a constitutional violation. *See Strickland,* 466 U.S. 668.

by his educators and coaches. Attempting to liken his case to *Rompilla* and *Wiggins v. Smith*, 539 U.S. 510 (2003), Robinson points to two facts his counsel were aware of which, according to him, should have indicated to them that there were "red flags" in his mental history that they should have explored further. First, Robinson points out that he was held back and had to repeat the third grade. Second, he says he was transferred to an alternative high school.

In its response brief, the government points to the declaration from Robinson's alternative-school teacher stating that Robinson had an excellent attitude and was open to learning. (Resp. Br. (Doc. # 2365), DX 11.) Robinson also graduated from high school and attended college for a period of time. As the Supreme Court explained in *Wiggins*, "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." 539 U.S. at 533. In analyzing whether a strategic decision is reasonable, the Court must ask whether "'reasonable professional judgments support the limitations on investigation.'" *Id.* (citations omitted). "A decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances." The Court concludes that Robinson has failed to demonstrate that his counsel's decisions were unreasonable. *Id.* (citations omitted).

Next, the Court will address Robinson's assertion that his trial counsel failed to adequately assess the effect on Robinson's mental state of childhood pesticide exposure and exposure to drugs and alcohol *in utero*. Post trial, Robinson was examined by Dr. Stephen Martin. (DX 2 at 1.) The results of Martin's testing establish, *inter alia*, that Robinson has an average-level verbal IQ of 102, a high-average performance IQ of 113, and a full-scale IQ of 107. (*Id.*) Robinson also demonstrated low-average to very superior skills in the remainder of the tests administered to him by Martin. (*Id.*) The only areas in which he had relatively low scores were reading, spelling, and arithmetic, which

were possibly indicative of learning disabilities. (*Id.*) Despite evaluating most of Robinson's skills and abilities as either low average to above average or within normal limits and adequate – with some skills described as mildly impaired – Martin concludes that Robinson's mental profile was "consistent with *subtle* cognitive deficits associated with chronic exposure to organophosphate pesticides combined with general learning disabilities." (Resp. Br. (Doc. # 2365) at 38 (citing DX 2 at page 3) (emphasis added).) Martin does not opine on the likelihood that these subtle cognitive defects would affect Robinson's ability to plan and implement the murder of three individuals.

Robinson further claims that his counsel was insufficient for failing to hire a mental-health expert and discover evidence of Robinson's *in utero* exposure to drugs and alcohol during his mother's pregnancy. (Supp. Pleading (Doc. #2432 ) at 22-23.) Robinson cites to the report of Dr. Kate Allen, who opines that Robinson's mental and social history made him more vulnerable to psychological and emotional problems throughout his life. (*Id.* at 22-23 (DX 77).) But the Court is not persuaded that presentation of such an opinion from Allen or a similar expert would have persuaded the jury, in light of all evidence to the contrary, that Robinson suffered so much and was so damaged by his mother's conduct that he is less culpable for the murder of three people.

Moreover, as the record demonstrates, numerous witnesses testified that Robinson's words and actions demonstrated that he was a person of normal intelligence. Thus, his attorneys' strategic decision not to attempt to portray him as a person with mental deficiencies sufficient to mitigate the murderous behavior he engaged in was a reasonable one. (*Id.*, GX A-C (Ball, Strickland and Cummings Affs.)) Again, the Court concludes that Robinson has failed to demonstrate that his counsel's failure to investigate was unreasonable and in violation of *Strickland*. *See* 466 U.S. at 668.

### b.    Failure to Adequately Investigate Social History

Robinson also criticizes his trial counsel for failing to sufficiently look for mitigating evidence in Robinson's social history. The evidence Robinson proffers includes, *inter alia*, declarations from his relatives and neighbors during the time he lived in Dermott, Arkansas. Notably, however, much of the substance of these declarations covers periods before Robinson's birth, including much of the declaration of his sister, Josephine Dotson, and the declarations of Mildred Hollimon, Milton Hollimon, John Hollimon Jr., Robert Hollimon, Beotha Moore, and Willie White. (DX 12-15, 24, 33.) Much of the evidence contained in the declarations is cumulative, including evidence cited in these affidavits as well as evidence contained in the affidavit of Robinson's father, Jimmie Lee, who reiterates the testimony given at trial by Robinson's uncle and mother. (DX. 30 at ¶¶ 2-3, 6, 15-16, 18.) Jimmie Lee's declaration briefly suggests that Robinson was touched sexually by a neighborhood boy when he was about five years old and that Robinson was upset by that experience, but, notably, there is no corroborating affidavit from Robinson. (DX 29 at ¶ 36; DX 30 at ¶¶ 9-10.) As to the declarations regarding Robinson's involvement with gangs during his youth in Arkansas, these merely confirm evidence that his trial counsel were already aware of but strategically chose not to emphasize at trial because they feared that evidence would harm Robinson's case more than it would help. (GX A, Ball Aff. at 6.) Ball states in his affidavit that, in his experience, "gang evidence is almost always detrimental to a defendant as jurors are very frightened of gangs," and that Robinson's trial counsel specifically chose "to depict Mr. Robinson's upbringing in Arkansas as largely positive and concentrate on the changes that began to occur when he was living with his drug-abusing mother in Arlington." (*Id.*) As the government correctly argues, trial counsel's informed choice on a strategic matter is entitled

to deference, even more so in a situation such as this where the evidence in question is "double-edged." (Resp. Br. (Doc. #2365) at 43 (citing *Boyle v. Johnson*, 93 F.3d 180, 187-88) (5th Cir. 1996); *Mann v. Scott*, 41 F.3d 968, 984 (5th. Cir. 1994); *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999). Notably, Robinson presents the Court with a schizophrenic view of his involvement with the Dermott Crips, simultaneously characterizing his experience as running with a bunch of youngsters who were merely portraying what they saw on television, (Supp. Pleading (Doc. #2432) at 6, DX 59), but also, according to Allen, being a part of his "highly toxic social environment." (DX 77 at 18.)

Robinson analogizes his claim of ineffective assistance of counsel to that of the defendants in three United States Supreme Court decisions holding that defense counsel had unreasonably failed to investigate mitigating circumstances: *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins* and *Rompilla*. The Court has already analyzed Robinson's claims with regard to the decision in *Rompilla* and will now examine *Williams* and *Wiggins*.

In *Williams*, the Supreme Court, reviewing a petition for certiorari, concluded that the defendant's trial counsel failed to investigate and present mitigating evidence during the sentencing phase of his capital murder trial. 529 U.S. 362. The Court found that the record established that Williams' trial counsel had (1) not begun preparation for sentencing until a week beforehand, (2) failed to "uncover extensive records graphically describing Williams' nightmarish childhood," (3) failed to introduce evidence available to them that Williams did not attend school beyond the sixth grade and was found to be "'borderline mentally retarded,'" (4) failed to examine prison records demonstrating Williams's commendations and positive actions in prison, including assistance breaking a prison drug ring and returning a stolen wallet, and (5) failed to elicit testimony from

prison officials who "described Williams as among the inmates least likely to act violently, dangerously, or provocatively, and from a prison minister that Williams seemed to thrive in a more regimented environment." *Id.* at 364-65. The Court concluded that Williams's trial counsel's omissions "clearly demonstrate[d] that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." *Id.* at 396. The Court held that these omissions had prejudiced Williams, concluding that "the graphic description of Williams's childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Id.* at 398 (citing *Boyde v. Cal.*, 494 U.S. 370 (1990)). Based on the entire post-conviction record, the Court concluded that the state trial judge was correct in holding that there was "'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all of the available evidence." *Id.* at 399. (quoting trial court record.)

In *Wiggins*, before the Supreme Court on a writ of certiorari, the Court held that trial counsel's decision not to expand their investigation of their client's life history beyond the presentencing report and records of the department of social services was unreasonable and that counsel's inadequate investigation prejudiced the defendant. 539 U.S. 510. The Court focused on whether counsel's investigation supporting their decision not to introduce mitigating evidence in their client's background "*was itself reasonable.*" *Id.* at 523. The Court held that the scope of Wiggins's counsel's investigation was unreasonable in light of what the department of social services's records revealed, including Wiggins's mother's chronic alcoholism and abuse of her children, as well as the fact that Wiggins was "shuttled from foster home to foster home," and had "lengthy absences from school." *Id.* at 526. During his post-conviction appeal, Wiggins's new

counsel hired a social worker who testified regarding a social-history report he prepared based on evidence of "severe physical and sexual abuse" Wiggins suffered throughout his childhood. *Id.* at 516. Wiggins was raised by an abusive alcoholic mother until the age of six, and was both severely abused and neglected as demonstrated by her leaving him and his siblings by themselves for days at a time, forcing them to beg for food and to eat garbage. *Id.* at 517. There was evidence that Wiggins's mother beat her children for breaking into the locked kitchen, that she once burned Wiggins's hand on a hot stove so badly he had to be hospitalized, and that she had sex in the same bed in which her children were sleeping. *Id.* There was also evidence that, following his removal from his mother's custody, Wiggins was physically and sexually abused and raped while in foster care and that he ran away at age sixteen and was homeless. He was later placed back into foster care where he was gang-raped by his foster brothers. Finally, he also allegedly was sexually abused by his supervisor in a Job Corp program. *Id.* The Court found that Wiggins's trial counsel were aware of some, but not all, of his history, and that they chose not to present all of the mitigating evidence they had in favor of trying to persuade the jury that Wiggins did not kill the victim by his own hand. The Court found this decision unreasonable and, comparing the case with *Williams*, noted that the mitigating evidence was stronger and the state's evidence in support of the death penalty was "far weaker" than in *Williams*, thus concluding that "the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of Wiggins' moral culpability." *Id.* at 537-38 (quoting *Williams*, 529 U.S. at 398).

As is the case with the facts in *Rompilla*, there are a number of important differences between Robinson's case and those of the defendants in *Williams* and *Wiggins*. First, there is no evidence in the record that Robinson suffered the same sort of physical and sexual abuse as Williams

and Wiggins. Nor does the evidence demonstrate that Robinson, who graduated from high school and attended some college, suffered from the same sort of mental impairment as Williams, who was identified as borderline mentally retarded. Robinson's counsel employed an experienced investigator and conducted a thorough investigation. And, far from the choice made by Williams's trial counsel not to examine prison records, Robinson's trial counsel presented evidence from no fewer than five prison officials who testified about Robinson's good behavior and positive adjustment to life in prison. Additionally, unlike defense counsel in *Williams* and *Wiggins*, Robinson's trial counsel presented numerous positive character witnesses for Robinson, including Robinson's high-school football coaches and teachers as well as one of his teammates.

Even if the Court assumes, *arguendo*, that Robinson's attorneys failed to adequately investigate factors affecting mitigation, his case is not aligned with *Williams* or *Wiggins* on the prejudice prong of the *Strickland* inquiry. In *Strickland*, the Supreme Court noted that a court should dismiss a claim of ineffective assistance of counsel under the prejudice prong of *Strickland* where it is easier to do so, and such is certainly the case here. *See Strickland*, 466 U.S. at 670. Evidence presented at trial demonstrated that Robinson was raised by his grandparents for much of his youth in a decent home and that he loved and respected them. Even if the new declarations provide evidence that his home life may have been less positive than was portrayed at trial and that he had some difficulty with school, that evidence does not demonstrate prejudice. It is clearly established that in order to prevail on his claim of insufficiency of counsel based on failure to investigate, Robinson "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *See United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989); *see also United States v. Lewis*, 786 F.2d 1278, 1283 (5th Cir. 1986) (same); *Berry v. King*,

765 F.2d 451, 454 (5th Cir. 1985). Robinson must demonstrate that "it is reasonably likely that the jury would have reached a different conclusion absent counsel's unprofessional errors." *See Soria v. Johnson*, 207 F.3d 232, 249 (5th Cir. 2000), quoting *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996). As the Court in *Wiggins* held, "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigation evidence." *See* 539 U.S. at 534. When the Court examines all of Robinson's mitigation evidence, including the evidence that was gathered post-conviction, the Court cannon conclude that it is reasonably likely a jury would have reached a different conclusion had the evidence that was discovered post-trial been admitted.

### 4.   Failure to Make a *Batson* Challenge.

Finally, in his last claim for relief based on the alleged insufficiency of his trial counsel, Robinson alleges that he was denied his constitutional rights by his counsel's failure to raise a *Batson* challenge on direct appeal in light of racial discrimination that Robinson alleges took place in the selection of his jury. (Mot. to Vacate (Doc. #2279) at 99 (citing *Batson v. Kentucky*, 476 U.S. 79 (1986).) A criminal defendant is constitutionally entitled to effective assistance of counsel on appeal. *Smith v. Robbins*, 528 U.S. 259 (2000) (applying the same standard to a claim of ineffective assistance of counsel on appeal as to such a claim against trial counsel); *Smith v. Murray*, 477 U.S. 527, 535-36 (1986). In order to establish his claim of insufficiency, Robinson must demonstrate that his counsel's failure to appeal the *Batson* issue fell below an objectively reasonable standard of professionalism, and he must also demonstrate that if his counsel had raised the issue, the appellate court would have granted a new trial. *See Miller-El v. Dretke*, 142 Fed. Appx. 802 (5th Cir. 2002).

Robinson alleges that racial discrimination "permeated" his entire trial, and that the government exercised peremptory challenges during jury selection in a racially discriminatory

manner in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). (Mot. to Vacate (Doc. #2279) at 88-99.) Specifically, Robinson asserts that he was denied equal protection under the law in violation of the Fourteenth Amendment when the government used peremptory challenges to prevent three African-American females, Charline Boulet, Dorothy Jean DeBose, and Marchesia Amarh from sitting on the jury and failed to articulate a credible race-neutral explanation for the challenges.

In *Strauder v. West Virginia*, 100 U.S. 303 (1880), the United States Supreme Court held that when a black defendant has been tried by a jury from which members of his own race have been purposely excluded, he has been denied equal protection of the law. In *Batson*, the Court reaffirmed this holding and further held that the Equal Protection Clause forbids a prosecutor from using his peremptory challenges to challenge potential jurors solely on account of their race. *See* 476 U.S. at 88. The Court also held that, in order to establish a claim of purposeful racial discrimination in the jury- selection process by the prosecutor's use of peremptory challenges, a criminal defendant must first make out a prima-facie case of purposeful discrimination by first showing that he is a member of a racial group capable of being singled out for differential treatment and that the prosecutor has exercised peremptory challenges to remove from the jury panel members of his race. A defendant must then show that these facts and other circumstances would support an inference that the prosecutor used the practice to exclude venire members based on their race. Once this showing has been made, the burden then shifts to the government to provide a race-neutral explanation for challenging the jurors. *Id.* at 96. If the government presents a racially neutral explanation for a strike, the trial court must decide whether the defendant has carried his burden of proving purposeful racial discrimination. *Id.* at 98; *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995).

In making the decision as to whether the defendant has met his burden of proof, the

truthfulness of the prosecutor's explanation must be determined by assessing the credibility and demeanor of the government's attorney. *Hernandez v. New York*, 500 U.S. 352, 365 (1991). This judgment is one that lies "peculiarly within a trial judge's province." *Id.* The standard of review is "clear error," and a trial court's ruling should not be considered clearly erroneous unless a reviewing court has the firm conviction that a mistake has been committed. *United States v. Cobb*, 975 F.2d 152, 154-56 (5th Cir. 1992), *citing Hernandez*, 500 U.S. at 369.

### a. Charline Boulet

First, it is important to note that both the government and Robinson's own counsel exercised a peremptory challenge against venire member Charline Boulet. (RIII/155.) Having struck venire member Boulet on their own, it is not surprising that Robinson's trial counsel did not raise a *Batson* challenge at the trial-court level. Because they did not, however, any claim based on the government's choice to strike her is waived on appellate review. *See Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 561-62 (5th Cir. 2001). Moreover, in his affidavit, prosecutor Fred Schattman also points to the fact that counsel learned from her answers during voir dire that her son frequented the CD shop "That Sounds Good," which the prosecution "knew to be the place where Nathan Henderson, Julius Robinson, John Turner and others gathered and was a front for the drug business they conducted." (Resp. Br. (Doc. #2365), GX D at 2.)

### b.    Dorothy Jean DeBose

The next venire member at issue is Dorothy Jean DeBose. The prosecutor indicated that he intended to peremptorily strike DuBose, and defense counsel made a *Batson* objection because DuBose is African American. (RIV/ 163-64.) Defense counsel argued that DuBose had not stated any unwillingness to apply the law properly and that there was nothing in her background that would

reasonably give rise to the government's motion to strike, so the strike must be racially motivated. (*Id.*) This Court, not yet deciding the question of whether defense counsel had established a prima-facie case of racial motivation, asked the prosecutor to respond. (*Id.*) Prosecutor Fred Schattman informed the Court that, as indicated in DuBose's questionnaire answers, she was known to members of Schattman's family and that he had gained "reputation information" about her. (*Id.,* GX D, Schattman Aff.) In his affidavit, Schattman explains that he had spoken with his sister-in-law, who had worked with DeBose at John Peter Smith Hospital, and with his brother, a state district judge, about DuBose, and that his brother said she "made snap judgments and would disregard all evidence to the contrary of that snap judgment." *Id.* Schattman also recalled during his discussion with the Court, that he had reviewed drug cases against DuBose's brother and spouse and that she was perhaps the same age as Robinson's mother and thus would not be a juror acceptable to the state under the circumstances. (*Id.*) DuBose had acknowledged the cases in her questionnaire answers numbered 73 and 80. (*Id.*) After conferring with another prosecutor, Schattman also added that DeBose had an apparent reluctance about the death penalty to a degree that made him uncomfortable. (RIV/167.)

Defense counsel responded that it wasn't established that relatives of DeBose had been the subjects of the federal cases Schattman recalled, and the court responded that it did not have to be established so long as the prosecutor believed it to be true. (*Id.*/167-68.) Moreover, defense counsel Ball recalled that he might have represented DeBose's husband before a grand jury, adding credence to Schattman's recollection. (*Id.*/168.)

This Court concluded that Robinson had failed to establish a *Batson* violation because the explanations for the peremptory strike given by the prosecution were race-neutral and because

Petitioner had failed to meet his burden of establishing that the government's reasons for the strike were pretextual in nature. (*Id./*169) (noting that DuBose's husband's conviction for drug trafficking was "certainly sufficient" for the prosecution to exercise a peremptory challenge).)

The Court agrees with the government that, in light of the facts surrounding the government's decision to peremptorily strike DuBose, it would not have benefitted defense counsel to appeal the government's choice to strike DuBose on *Batson* grounds. Additionally, as this Court noted at the time, there was no similarly situated non-black venire member whom the government chose not to strike. Thus, Robinson has not demonstrated that his counsel committed error in choosing not to raise this issue on appeal. *See United States v. Montgomery,* 210 F.3d 446, 453 (5th Cir. 2000), quoting *United States v. Bentley-Smith,* 2 F.3d 1368, 1373 (5th Cir. 1993)) (noting that deference to the trial court is highly warranted where the government's reasons are plausible and not fantastic or inconsistent with its treatment of non-minority jurors).

### c.    Marchesia Amarh

The third peremptory strike at issue was against venire member Marchesia Amarh. Upon questioning during voir dire, Amarh indicated that she was generally not in favor of the death penalty, commenting that she just did not "agree with it." (R7/87.) Her questionnaire also indicated that she had mixed feelings about the death penalty. (Questions 45, 46, 47, 49, 52, and 52a.) But she indicated when questioned that she believed that there are some circumstances that warrant the death penalty. (*Id./*88.) When asked by the prosecutor if she likened her position to that of a conscientious objector who sees the need for war but chooses not to participate in a way that would result in killing (*Id./*88-89), Amarh responded:

> It's kind of hard to say. If I have to do it, you know, as a duty, I will do it.
> But I just don't like, you know, the death penalty. I don't know exactly how

-36-

to say it, but I feel strongly against the death penalty. But if for some – it depends on the circumstances. The circumstances would have to be very strong if I have to do jury duty.

(R7/89).

Although the prosecution did not believe that Amarh's answers gave rise to a reason to strike Amarh for cause, they chose to exercise a peremptory strike against her, and defense counsel objected under *Batson*. (*Id./*101.) Defense counsel Strickland argued that the government's choice to strike Amarh was racially motivated because her answers indicated that she could vote for the death penalty in the right circumstances. The Court did not decide whether a prima-facie case of discrimination had been established, but asked the prosecutor to provide a race-neutral reason for striking her, and the prosecutor responded that she had "expressed great reluctance concerning the death penalty" and pointed out that the prosecution had earlier struck a white venire member with similar views on the death penalty (venire member Broadwell.) (*Id./*103.) Accepting the prosecutor's explanation as valid, the Court overruled the *Batson* challenge. A later review of the questions posed to Broadwell reveals that she did not have similar views to Amarh, but Schattman was apparently reviewing the wrong questionnaire when interviewing her. (*Id./*70-72.) Regardless of that mistake, however, this Court accepted Schattman's race-neutral explanation for striking Amarh based on her answers in her questionnaire and voir dire regarding the death penalty.

Robinson has not demonstrated that his counsel would have had a reasonable likelihood of success in raising a *Batson* claim before the Fifth Circuit. Robinson likens his case to *Miller-El II*, but the two cases have very little in common. First, the Court in *Miller-El II* found that the state prosecutor's office had an institutional policy of trying to keep

African Americans from serving on juries. *Miller-El II*, 125 S.Ct. at 2338-39. Robinson does not even suggest that such a policy existed in the United States attorney's office. Second, the inconsistencies present in *Miller-El II* do not exist in Robinson's case. As the Court discussed previously, the prosecution's decision to strike DeBose was based on her husband's conviction for federal drug trafficking in a case in which the prosecuting attorney had some involvement. As for Amarh, the Court does not accept Robinson's argument that white jurors with similar backgrounds were not struck. The prosecution struck a number of white venire members with similar views. First, the prosecution struck William Watson (RII/6-26) who, like Amarh, varied on his opposition to the death penalty. The prosecution also struck Martinets, a white juror who indicated on her questionnaire that she was strongly against the death penalty, but who revealed in her answers that she could follow the law. (RIII/27-39.) Robinson charges that the government chose to keep venireman Broome, a white juror whom Robinson claims shared Amarh's views. Broome's questionnaire and answers in court, however, revealed that he was consistently in favor of the death penalty in spite of the fact that he would have difficulty making the decision. (RII/75-80, 91.) Likewise, white venirewoman Mills stated that she could impose the death penalty, but noted that it would be a hard decision. (RIII/136-39, 145-46, 148.) And, unlike Amarh, she did not provide any answers in her questionnaire indicating that she opposed the death penalty. Robinson also points to the answers in questionnaires submitted by venire members Tribout and Banser. Tribout, however, both in his questionnaire and in his voir-dire answers, indicated that he was not opposed to the death penalty and that he could impose it, albeit with extreme care. (RIV/5, 7-8, 13-14.) Banser's questionnaire answers likewise revealed

-38-

that she was in favor of the death penalty. She did state, however, that if a sentence of life without release was available, she could not recommend a death sentence, but she wrote a note on her questionnaire explaining that "It would be a very hard decision. Not truely [sic] certain about this." (*Id.*/109-11 (Question 52a).) When asked about her answer during voir dire, she clarified that if the facts justified a sentence of death that she could impose it. (*Id.*/111-14, 117.) Thus, none of the jurors Robinson points to have views similar to Amarh's. Nor does Robinson's suggestion that the government questioned Amarh more aggressively have merit. *Cf. Miller-El II*, 125 S.Ct. at 2333-37. Robinson points specifically to the prosecutor's question to Amarh regarding whether she felt like a conscientious objector regarding the death penalty. But the prosecution also questioned venire member Watson, a white venire member, about whether he would personally be able to participate in a decision leading to Robinson's death. (*Cf.* RII/13-14 with R7/88-91.) Similarly, the prosecutor asked the same of venire member James, also white. The Court finds no merit to Robinson's claim that the government chose to ask difficult questions only of black venire members.

In sum, the Court concludes that Robinson has failed to demonstrate that his counsel performed below a reasonable professional standard in choosing not to raise *Batson* as a ground in Robinson's appeal. His claim of ineffective assistance of counsel on this basis is therefore denied.

The Court notes that Robinson also attempts to make a collateral *Batson* challenge, but this claim is procedurally barred because it was not raised on direct appeal but could have been. *See Massaro v. United States*, 538 U.S. 500 (2003); *United States v. Shaid*, 937

-39-

F.2d 228 (5th Cir. 1992). The Court agrees with the government that the alleged ineffectiveness of Robinson's counsel cannot serve as the requisite cause for his failure to raise the *Batson* issue on direct appeal as there was no meritorious *Batson* issue to be raised. Moreover, Robinson has not demonstrated the requisite prejudice. His claim is therefore denied.

### B.    Equal Protection Violations--Grounds II and III.

In addition to claims regarding the sufficiency of his counsel, Robinson alleges violations of his equal-protection rights. The first of these alleged violations is essentially a selective-prosecution claim. (Mot. to Vacate (Doc. #2279) at 97-99.) Specifically, Robinson contends that the government violated his constitutional rights because it used ethnicity as a basis for seeking the death penalty against African-Americans like himself. Robinson bases his claim on statistics that purport to show that the government has sought the death penalty against African-American defendants with disproportionate frequency as compared to defendants of other races. Robinson also claims that his equal-protection rights were violated by the discriminatory application of the Federal Death Penalty Act ("FDPA").

Robinson claims, pursuant to the Supreme Court's opinion in *McClesky v. Kemp*, 481 U.S. 279 (1987), that he was purposefully discriminated against in the manner in which the FDPA was applied to him. (Mot. to Vacate (Doc. #2279) at 97-99.) Robinson made a pretrial motion to dismiss the government's notice of its intent to seek the death penalty on the ground of racial discrimination. *See* (Mot. to Dismiss (Doc. #1404), filed December 21, 2001). He also filed a subsequent motion partially on this same topic, along with a survey purporting to demonstrate racial discrimination by the Department of Justice. See (Mot.

Regarding Government's Intent to Seek the Death Penalty and Special App. (Docs. #1443 and 1444), filed January 10, 2002).) The Court denied relief. (Order Denying Mot. Regarding Government's Intent to Seek the Death Penalty (Doc. #1575), filed February 19, 2002).) Robinson did not pursue the claim on appeal, although he could have, and therefore may not now raise the claim collaterally because it is procedurally barred. *See, e.g., Massaro,* 538 U.S. at 504; *Shaid,* 937 F.2d at 231-32 .

Even assuming that Robinson's selective-prosecution claims are not procedurally barred, they nevertheless fail on the merits. In *United States v. Armstrong,* 517 U.S. 456 (1996), the Supreme Court addressed the appropriate standard for establishing a selective-prosecution claim. In *Armstrong,* the Court first noted that, absent clear evidence to the contrary, there is a presumption that prosecutors have properly discharged their duties. The Court then stated that, in order to dispel this presumption and establish that a criminal defendant has been selectively prosecuted on the basis of his race, he must show that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. And, in order to establish a discriminatory effect, the defendant must show that similarly situated individuals of a different race were not prosecuted. *Id.* at 464-65.

Robinson argues that the statistical evidence he has produced in the form of the department-of-justice survey, combined with his *Batson* challenges, is sufficient to establish a prima-facie selective-prosecution case. As previously mentioned, however, without meritorious *Batson* challenges to rely upon, Robinson is left only with statistics to support his argument. In *United States v. Jones,* 287 F.3d 325, 333-35 (5th Cir.), *cert. denied,* 537

U.S. 1018 (2002), the Fifth Circuit was presented with a Department of Justice Report, titled "Department of Justice, The Federal Death Penalty System: A Statistical Survey (1988-2000)," as support for a selective-prosecution claim and ruled that this evidence was not sufficient to establish a prima-facie case. Robinson simply presents similar and no more compelling statistical evidence – notably without any further citation – to the statistical evidence that the Fifth Circuit has previously held to be insufficient to support a claim of selective prosecution. Thus, Robinson's claim for relief on selective-prosecution grounds is denied.

### C.    Robinson's Claim that the Prosecution Pursued Fundamentally Inconsistent Theories at Seriatim Capital Trials – Ground IV.

Robinson next claims that his due-process rights have been violated by the prosecution's alleged pursuit of fundamentally inconsistent theories at seriatim capital trials. (Mot. to Vacate (Doc. #2279) at 102.) According to Robinson, the prosecution claimed that Robinson was the leader and the most culpable of the co-defendants during Robinson's trial, but did the opposite at L.J. Britt's trial, which took place after Robinson's. Like Robinson's previous claim, this claim is procedurally defaulted as a result of Robinson's failure to raise it on appeal. L.J. Britt's trial was concluded long before Robinson's appellate brief was filed in July 2003. Thus, Robinson's counsel could have raised the issue on direct appeal but chose not to, and Robinson may not now raise it on collateral review. *Massaro*, 538 U.S. at 504.

Moreover, Robinson's claim, which is without any citation to the record, lacks merit. The author of this opinion, Terry R. Means, presided over both trials and is well aware that Robinson was consistently portrayed as the leader of the group, and that L.J. Britt was not.

-42-

**D.     Robinson's Claim that the Prosecution Knowingly Presented False Evidence Regarding the Penalty Phase Aggravating Factor of Future Dangerousness – Ground V.**

Robinson also claims that the prosecution knowingly presented false evidence regarding the penalty-phase aggravating factor of future dangerousness – specifically regarding the alleged "hit" on Michael "One Love" Williams. According to Robinson, the government was aware, because of the FBI's interview with Louis Johnson, that the group attacked Williams due to the alleged bad-drug sale, but nevertheless "made no effort to either correct the misapprehension in front of the jury or to tell defense counsel about Johnson's *perspective*." (Mot. to Vacate (Doc. #2279) at 105.) It should be noted that Robinson has not presented any evidence to this Court that either Williams or Henderson ever stated that they lied at Robinson's trial. Even if Robinson's allegations are true, however, Robinson has shown no due-process violation.

In *Giglio v. U.S.* , 405 U.S. 150 (1972), the United States Supreme Court addressed due process in the context of a claim that the government knowingly used or failed to correct false testimony. *Id.* In order to prove such a violation, Robinson must first demonstrate that there was false testimony. *See United States v. Mason*, 293 F.3d 826, 828 (5th Cir. 2002) (citing *Giglio*, 405 U.S. at 153 and *Napue*, 360 U.S. 264, 271 (1959)). Second, he must show that the government knew the testimony was false. And lastly, Robinson must demonstrate that the false testimony was material to the outcome of his trial. *See id.* "This rule also applies to false statements made during the prosecutor's rebuttal closing." *United States v. Gonzales*, 436 F.3d 560, 580 (5th Cir. 2006); *United States v. Williams*, 343 F.3d 423, 439 (5th Cir. 2003). Robinson has failed even to allege that the government knew that

any testimony given by Henderson or Williams was false. The fact that the testimony was challenged by another witness or was inconsistent with prior statements is not sufficient for Robinson to meet his burden. *Id.* Based on the evidence presented, the Court concludes that Robinson has not met his burden.

Robinson has also failed to demonstrate that the allegedly false testimony was material to the outcome of his trial. In order to demonstrate materiality, Robinson must show that there was a reasonable likelihood that the false testimony would have affected the judgment of the jury. *Giglio*, 405 U.S. at 153-54 (quoting *Napue*, 360 U.S. at 271). In addition to the Williams and Tucker incidents, the prosecution presented evidence of Robinson's wanton murders, the facts of which were largely undisputed, as well as voluminous evidence of his drug-dealing activities. In light of all of the evidence in the record, the Court concludes that Robinson has failed to meet his burden of establishing materiality, and his claim is denied.

### E.    Robinson's Motion for New Trial.

Finally, Robinson's motion is couched, in the alternative, as one for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. This Court, however, is without jurisdiction to entertain such a motion. Federal Rule of Criminal Procedure 33 provides that a motion for new trial based on any ground other than newly discovered evidence must be filed within seven days of the guilty verdict. After that the district court is without authority to act. *See* Fed. R. Crim. P. 33; *Herrera v. Collins*, 506 U.S. 390, 409 (1993) (Rule 33 time limits are strictly construed); *United States v. Cook*, 670 F.2d 46, 48 (5th Cir. 1982); *United States v. Granza*, 427 F.2d 184, 186 (5th Cir. 1970). Moreover,

under the law of the Fifth Circuit, a motion for new trial cannot be based on "newly discovered evidence" that trial counsel was ineffective. *United States v. Medina*, 118 F.3d 371, 372 (5th Cir. 1997); *United States v. Ugalde*, 861 F.2d 802, 807-809 (5th Cir. 1988).

## F.    Motion for Evidentiary Hearing.

Robinson also requests that this Court conduct an evidentiary hearing on the claims he raised in his motion. (Mot. to Vacate (Doc. #2279)at 99, 106.) Section 2255 does not automatically require a hearing to dispose of every motion made under its authority. *Coco v. United States*, 569 F.2d 367, 369 (5th Cir.1976). But § 2255 does require a hearing unless the motion, files, and record of the case conclusively show that no relief is appropriate. *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992). Conclusive, rather than direct evidence, is required in order to deny relief without a hearing. *United States v. Drummond*, 910 F.2d 284, 285 (5th Cir. 1990). Bona fide or contested fact issues must be resolved on the basis of an evidentiary hearing. *Booth v. United States*, 507 F.2d 243 (5th Cir. 1975); *Reagor v. United States*, 488 F.2d 515 (5th Cir. 1973).

Although the government has stated that it would agree to a limited evidentiary hearing on contested issues of fact pertaining to Robinson's claims of insufficiency of counsel (Supp. Resp. (Doc. #2439) at 10), the record before this Court, including the exhibits submitted by Robinson with his motion, do not create any contested fact issues that must be resolved in order to decide Robinson's claims. With regard to the claims for which Robinson has submitted additional evidence, the Court has decided these claims either by assuming that everything Robinson alleges is true or based on legal, not factual, bases. Accordingly, because the record before this Court shows conclusively that Robinson is not

entitled to relief, his request for an evidentiary hearing is denied.

Robinson's Motion to Vacate his conviction and sentence under 28 U.S.C. § 2255

is hereby DENIED.

The clerk of the Court shall transmit a copy of this order to Robinson by certified

mail, return receipt requested.

SIGNED November 7, 2008.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

# CERTIFICATE OF SERVICE

I, the undersigned, declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202; that I am over the age of eighteen years; that I am not a party to the above-entitled action; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, and the United States Court of Appeals for the Fifth Circuit, at whose direction the service by United States Postal Service delivered described herein was made to:

SUSAN COWER
Assistant United States Attorney
United States Attorney's office
1100 Commerce Street, 3rd Floor
Dallas, TX 75242

A copy of: **APPENDIX A**

This certification is executed on October 20, 2009, at Los Angeles, California.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dolores Coultas