CA No. 09-70020
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| JULIUS OMAR ROBINSON, | ) | DC Nos.: |
| | ) | Civil No. 4:05-CV-00756-Y |
| Defendant-Petitioner, | ) | Criminal No. 4:00-CR-00260-2 |
| v. | ) | |
| | ) | **DEATH PENALTY** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Respondent. | ) | |
| | ) | |
| _____ | ) | |

_____

## PETITION FOR REHEARING EN BANC
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
HONORABLE TERRY R. MEANS
United States District Judge

SEAN K. KENNEDY
Federal Public Defender
E-Mail: Sean_Kennedy@fd.org
CRAIG HARBAUGH
E-Mail: Craig_Harbaugh@fd.org
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, CA 90012
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

MICHAEL CHARLTON
Deputy Federal Public Defender
E-Mail: mike_charlton@fd.org
Federal Public Defender's Office
411 East Bonneville Avenue, Ste. 250
Las Vegas, NV 89101-6632
Telephone: (702) 388-6577
Facsimile: (702) 388-6261

Attorneys for Defendant-Petitioner

## STATEMENT OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons

and entities as described in Rule 28.2.1 have an interest in the outcome of this

case. These representations are made in order that the judges of this court may

evaluate possible disqualification or recusal.

| | |
|---|---|
| Attorney for Appellant-Defendant<br>SEAN K. KENNEDY<br>Federal Public Defender<br>Office of the Federal Public Defender<br>321 E. 2nd Street<br>Los Angeles, CA 90012<br>Telephone: (213) 894-5063 | Attorney for Appellant-Defendant<br>CRAIG A. HARBAUGH<br>Deputy Federal Public Defender<br>Office of the Federal Public Defender<br>321 E. 2nd Street<br>Los Angeles, CA 90012<br>Telephone: (213) 894-7865 |
| Attorney for Appellant-Defendant<br>MIKE CHARLTON<br>Deputy Federal Public Defender<br>Office of the Federal Public Defender<br>411 East Bonneville Ave., Ste. 250<br>Las Vegas, NV 89101-6632<br>Telephone: (702) 388-6577 | Appellant-Defendant<br>JULIUS OMAR ROBINSON<br>BOP No. 26190-177<br>USP - Terre Haute<br>P.O. Box 33<br>Terre Haute, IN  47808 |
| Attorney for Appellee-Plaintiff<br>SUSAN COWGER<br>Assistant United States Attorney<br>U.S. Attorney's Office<br>1100 Commerce Street, 3rd Fl.<br>Dallas, TX 75242-1699 | |

DATED: August 6, 2010       */s/ Craig A. Harbaugh*
                                       CRAIG A. HARBAUGH

**STATEMENT PERTAINING TO EN BANC REVIEW**

The panel decision conflicts with *Miller El v. Cockrell*, 537 U.S. 322

(2003), necessitating en banc review.  In *Miller El*, the Supreme Court held an

appellate court may not decide the merits of a claim before denying a Certificate of

Appealability (COA).  But that is precisely what the panel did in Robinson's case.

After paying lip service to the COA standard, the panel simply adopted the district

court's finding that Robinson could not demonstrate prejudice resulting from his

trial counsel's deficient performance.  Not only did the panel conduct a full (albeit

inadequate) analysis of the merits of Robinson's claims, the panel unreasonably

narrowed Robinson's entitlement to a COA by refusing to consider whether

reasonable jurists could at least debate his claims.  While Robinson aptly satisfied

this modest burden for all claims, he clearly did so regarding the district court's

refusal to grant an evidentiary hearing.  In light of the Government's concession

that Robinson was entitled to an evidentiary hearing on his ineffective-assistance-

of-counsel claims, reasonable jurists could easily debate whether the district court

erred in denying Robinson a hearing.  Consequently, because the panel's decision

contravenes *Miller El*, consideration by the full court is therefore necessary to

secure and maintain uniformity of the court's decisions regarding the COA

inquiry.

## <u>TABLE OF CONTENTS</u>

**PAGE**

STATEMENT OF INTERESTED PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT PERTAINING TO EN BANC REVIEW. . . . . . . . . . . . . . . . . . . . ii

ISSUE MERITING EN BANC CONSIDERATION. . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE COURSE OF PROCEEDINGS. . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     1.    Robinson and Britt are Charged With Death-Eligible Offenses. . . . . 3

     2.    Robinson Received the Death Penalty. . . . . . . . . . . . . . . . . . . . . . . 3

     3.    Britt Received a Life Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                    **PAGE(S)**

*Abdul Kabir v. Quarterman*,
    550 U.S. 233 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Banks v. Dretke*,
    540 U.S. 668 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Jimenez v. Quarterman*,
    129 S. Ct. 681 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Jones v. United States*,
    527 U.S. 373 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Medellin v. Dretke*,
    544 U.S. 660 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Miller El v. Cockrell*,
    537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Rompilla v. Beard*,
    545 U.S. 374 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Slack v. McDaniel*,
    529 U.S. 473 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Tennard v. Dretke*,
    542 U.S. 274 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Cavitt*,
    550 F.3d 430 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Webster v. Cooper,*
    130 S. Ct. 456 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                    **PAGE(S)**

*Wiggins v. Smith,*
     539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Williams v. Taylor,*
     529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**FEDERAL STATUTES**

18 U.S.C. § 3593. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13

Fed. R. App. P. 35(a)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## ISSUE MERITING EN BANC CONSIDERATION

Whether the panel contravened *Miller El v. Cockrell*, 537 U.S. 322 (2003) in denying a COA by conducting a full merits review of Robinson's claims and refusing to consider whether the issues were debatable by jurists of reason?

## STATEMENT OF THE COURSE OF PROCEEDINGS

Robinson timely filed a motion pursuant to 28 U.S.C. § 2255 in the district court for the Northern District of Texas.  (Dkt. 2279.)  Robinson raised, *inter alia*, that he received ineffective assistance of counsel ("IAC") during the penalty phase of trial in violation of the Sixth Amendment.  Robinson supported his pleadings with over 80 exhibits totaling more than 1,000 pages.  These exhibits included 56 lay witness declarations, 4 expert examinations, and numerous police reports, court documents, and public records.

The Government opposed Robinson's motion.  However, the Government twice conceded that the district court should hold an evidentiary hearing "[b]ecause there are factual disputes raised by the pleadings on the [IAC claims]." (Response at p. 90 (Dkt. 2365); Supp. Resp. at p. 10 (Dkt. 2439).)

Notwithstanding Robinson's repeated requests and the Government's repeated concessions, the district court refused to conduct an evidentiary hearing

1

on Robinson's IAC claims. In denying Robinson's motion exclusively on the pleadings, the district court made factual findings and evaluated witness credibility. The district court also denied Robinson's application for a COA. (Dkt. 2473.)

On October 21, 2009, Robinson applied for a COA with the Court raising three claims: (1) IAC for failure to investigate and rebut aggravating evidence; (2) IAC for failure to investigate and present mitigating evidence; and (3) denial of evidentiary hearing for the IAC claims. On June 8, 2010, the panel denied Robinson's COA in its entirety. Regarding the first claim, the panel "conclude[d] no reasonable jurist would find that Robinson was prejudiced by the above alleged deficiencies." (Op. at p. 7.) In rejecting a COA for the second claim, the panel simply found that "[a]ny reasonable jurist would agree with the district court's holding that neither strand of Robinson's new mitigation evidence shows IAC." (Op. at p. 9) Finally, the panel denied a COA for the third claim "[b]ecause Robinson has not shown that the district court erred by denying his motion for a hearing." (Op. at p. 11.)

On July 21, 2010, the Court granted Robinson's extension to and including August 6, 2010 to file a Petition for Rehearing. The instant petition is therefore timely.

<u>**STATEMENT OF FACTS**</u>

**1.     Robinson and Britt are Charged With Death-Eligible Offenses**

Julius Robinson and L.J. Britt were charged with numerous criminal counts based on alleged conduct in Nathan Henderson's drug-trafficking enterprise.  In addition to the drug offenses, the prosecution charged Robinson and L.J. Britt with killing Johnny Shelton, who was mistaken for the man who hijacked Robinson at gunpoint and stole $30,000.  Robinson, along with Angelo Harris, was also accused of killing Juan Reyes, after his brother-in-law sold them a $17,000 block of wood instead of narcotics.  Robinson was also charged with being a member of the conspiracy when Britt killed Rudolfo Resendez.  The government sought the death penalty only for Robinson and Britt.

**2.     Robinson Received the Death Penalty**

During the penalty phase of Robinson's trial, the prosecution presented evidence of three prior bad acts:  (1) a 1996 state conviction for "Deadly Conduct by Discharging Firearm at an Individual," for which he "received deferred adjudication"; (2) an uncharged allegation that Robinson ordered the murder of prosecution witness, Michael "One Love" Williams; and (3) Robinson's prior membership in the "Playboy Hustler Crips."  The defense offered no evidence to rebut these allegations.

Robinson's trial attorneys refused to hire a mitigation specialist and, as a result, presented the jury a superficial portrait of Julius Robinson. Trial counsel interviewed only those witnesses Robinson identified who "might make good fact witnesses for him." (Resp. Ex. C at p. 1 (Aff. of Bruce Cummings).) These were limited to football coaches who called Robinson hardworking and respectful on the gridiron (20 RT 2-10; 21 RT 43-53.)[1]; guards from the detention center, who testified that Robinson was a model inmate (21 RT 18-43, 54-74, 81-120.); and Mark Cunningham, Ph.D., who was never permitted to evaluate Robinson, but who testified that Robinson posed a low risk of future dangerousness. (21 RT 18-43, 54-74, 81-120.)

The defense gave the jury a paltry and incomplete view of Robinson's home life by calling merely an uncle, John Hollimon (21 RT 131-52), and his mother, Rose Hollimon (21 RT 153-70). John testified that his sister, Rose, had problems with alcohol (21 RT 141) but that Julius had a stable environment when he lived with his grandparents in Dermott, Arkansas, and that his problems did not begin until he moved from Dermott to Texas to live with his mother. (21 RT 142.) Rose admitted smoking "primos" – cocaine-laced marijuana cigarettes – but told

_____

[1]"RT" refers to the reporter's transcripts of the trial proceedings in *USA v. Julius Robinson.*

the jury that she had conquered the addiction, and downplayed the effect of drug addiction on her children.  (21 RT 167-68.)

The jury fixed Robinson's sentence at death for the Shelton and Reyes murders and a life sentence for the Resendez murder.  In reaching its general verdict, the jury also issued several special verdicts.  The jury unanimously concluded beyond a reasonable doubt that Robinson "is a future danger to the lives and safety of other persons."  (Ex. 45 at p. 4.)  The jury was also directed to answer whether "Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of parental guidance and protection that he needed."  (Ex. 45 at p. 7.)  Not a single juror found that the evidence presented regarding Robinson's background justified a lesser sentence.  (Ex. 45 at p. 7 (reflecting "0").)

**3.     Britt Received a Life Sentence**

Britt's trial provides insight into the effect of Robinson's trial counsels' failures.  Like Robinson, Britt had been charged with personally killing two individuals, Shelton and Resendez, and with participating extensively in the interstate drug trafficking operation.  Like Robinson, Britt's penalty phase consisted of prior acts of violence, in addition to the capital crimes, including two home burglaries and the robbery of a family at gunpoint.  According to testimony,

Britt terrorized four young children during the robbery by firing his weapon when their frantic mother failed to produce some money. Also like Robinson, the Government alleged that Britt had been linked to the Dermott Crips.

In contrast to Robinson's case, however, Britt's attorneys presented a more coherent and detailed picture of Britt's life during the punishment phase of trial. Britt's younger sister, Felicia, characterized him as a kind and loving brother who had been a positive influence on her life, including encouraging her to graduate from high school. (24 BRT 73-91.)[2] Britt's first cousin recounted his generosity when she was confined to a wheelchair, including cooking, babysitting for her children, and even the un-glamorous task of emptying her commode. (24 BRT 92-105.) A close friend explained the attention Britt had shown toward her eight children and had often babysat for them. (24 BRT 114-25.) Kimmy Burnett, his then current girlfriend, testified about his constant moral support. (24 BRT 158-67.) Zadrian Johnson talked about how Britt was a positive role model in his life, dissuading him from hanging out in the streets. (24 BRT 168-74.) To further elucidate Britt's positive attributes, the defense called two Tarrant County Sheriff's Department employees – a records manager and a jailer – to testify

---

[2]"BRT" refers to the reporter's transcripts of the trial proceedings in *USA v. L.J. Britt*.

regarding Britt's lack of disciplinary infractions in jail prior to trial. (24 BRT 52-72.) Apart from character witnesses, Britt's stepfather and mother testified on his behalf. Stepfather Larry Robinson discussed the privation that Britt suffered in his life and spoke about his son's nonviolent behavior. (24 RT 155-57.) Britt's mother, Betty Jean, related her struggle to care for Britt when he was younger and his good grades in school. In the end, Betty Jean made a passionate plea for her son's life. (24 BRT 182-214.)

After hearing the mitigation presented in Britt's case, the jury sentenced him to life without the possibility of parole. The evidence which compelled the jury to give Britt a life sentence paled in comparison to the wealth of available mitigating evidence in Robinson's background – evidence that Robinson's jury never heard. Britt came from a very loving close-knit family and was raised by his father and stepmother. A psychologist evaluated Britt and determined that Britt did not have any mental disorders. (Ex. 56 at ¶ 5.) In stark contrast, Robinson suffered from brain damage as a result of fetal alcohol exposure and childhood pesticides. Robinson also had a miserable upbringing, marred by a violent infancy and willful neglect until adulthood. (*See, generally*, Exs. 1, 2, 63, 77.) In addition to extensive mitigation evidence, Robinson's jury never learned the information refuting the Government's aggravating evidence. Specifically, the jury did not

hear evidence that Robinson had nothing to do with the assault on Michael "One Love" Williams, that he only shot into an empty car and did not attempt to murder Sarah Tucker, and that he was never associated with a violent gang.

## ARGUMENT

En banc reconsideration is appropriate when "necessary to secure or maintain uniformity of the court's decisions." Fed. R. App. P. 35(a)(1)(A). This occurs when the panel decision conflicts with either a decision of the Court or a decision of the United States Supreme Court. Fed. R. App. P. 35(a)(1)(B). As set forth below, the panel decision directly contravenes *Miller El* necessitating en banc review.

The Supreme Court has delineated specific procedures for determining whether a Certificate of Appealability (COA) should be granted. "[A] prisoner seeking a COA need only demonstrate 'a substantial showing of the denial of a constitutional right.'" *Miller El*, 537 U.S. at 327. A COA must issue if either: (1) "jurists of reason could disagree with the district court's resolution of his constitutional claims" or (2) "that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Id.* (citations omitted); *see also Slack v. McDaniel*, 529 U.S. 473, 483 (2000). When the petition is denied on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the

district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. A petitioner need not show "that the appeal will succeed." *Miller El*, 537 U.S. at 337. "Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that Petitioner will not prevail." *Id.* at 338. In conducting the COA determination, the court of appeals conducts only a "threshold inquiry" and is strictly forbidden from engaging in "full consideration of the factual or legal bases adduced in support of the claims." *Id.* at 336.

Despite the Supreme Court's clear directive, this Court has routinely misapplied the COA standard. For example, in *Tennard v. Dretke*, 542 U.S. 274 (2004), the Supreme Court reversed the Court's denial of a COA, noting that the Court had simply "pa[id] lipservice to the principles guiding issuance of a COA." *Id.* at 283. Similarly, in *Banks v. Dretke*, 540 U.S. 668 (2004), the Supreme Court faulted the Court for denying a COA, concluding that the application "surely fits" the standard. *Id.* at 703-05. Indeed, the Supreme Court has repeatedly granted relief to the habeas petitioner despite this Court's conclusion that the COA standard was not met. *Jimenez v. Quarterman*, 129 S. Ct. 681 (2009) (reversing COA determination regarding timeliness of petition); *Abdul Kabir v. Quarterman*, 550 U.S. 233 (2007) (concluding that state court misapplied clearly established law

9

and reversed the Fifth Circuit's denial of COA); *see also Webster v. Cooper,* 130 S. Ct. 456 (2009) (per curiam) (granting certiorari, vacating and remanding in light of *Jimenez*); *Webster v. Cooper*, No. 08-30435 (5th Cir. Jun. 9, 2009) (denying COA); *cf. Medellin v. Dretke*, 544 U.S. 660, 661 (2005) (granting certiorari even though the Court denied a COA but dismissing after petitioner filed a second habeas petition in state court).

In this case, a panel of this Court has once again ignored the dictate of *Miller El*. Although the panel recited the proper standard for making the COA determination, it failed to adhere to that standard. Rather than conducting a threshold inquiry, the court incorrectly engaged in a full merits review of Robinson's IAC claims. After cataloguing the evidence in support, the panel placed exclusive weight on the prosecution's aggravating evidence and the defense's anemic presentation at trial while discounting the rebuttal and mitigating evidence offered in the habeas proceedings to find that Robinson would not be entitled to relief.

The panel required Robinson to prove too much at the COA stage. The panel did not dispute Robinson's contention that trial counsel's total failure to conduct an investigation into either the aggravating or mitigating evidence constituted deficient performance. Instead, the panel focused exclusively on the

10

issue of prejudice.  Essentially, the panel found that because Robinson's new evidence failed to conclusively undermine the prosecution's case in aggravation, the jury would have still found that Robinson was a future danger.  ("Even if Robinson had been able to introduce all of his newfound rebuttal evidence, the jury would have been left with plausible evidence").  (Op. at p. 7.)  Not only does the panel's analysis distort the prejudice standard generally, it fails to take into account the prosecution's substantial burden for proving aggravating evidence.  Before the jury may consider any aggravating factor, including future dangerousness, the prosecution was required to prove its existence beyond a reasonable doubt.  *Jones v. United States*, 527 U.S. 373, 377 (1999); 18 U.S.C. § 3593(c).  Even if, as the panel contends, Robinson only put a "dent" into the aggravating evidence  (Op. at 7),  this would still have been enough to negate the jury finding.  Without this rebuttal evidence, the jury unanimously found the future dangerousness factor.

In a similar vein, the panel discounted Robinson's mitigation evidence to the point of irrelevance.  For example, despite presenting extensive evidence confirming Robinson's brain damage, including expert testimony, school reports and medical records, the Court concluded that the evidence was "exceedingly thin." (Op. at p. 9.)  Again, even if the panel were correct, the jury could have still relied upon the evidence to spare Robinson's life.  Unlike the high standard for proving

11

aggravating evidence, the jury may consider a mitigating factor in its weighing process so long as one juror finds that the defendant established its existence by preponderance of the evidence. 18 U.S.C. §§ 3593(c), (d). There is every reason to believe that this mitigating evidence would have made a difference to Robinson's jury. Based upon the paltry presentation during the penalty phase, not a single juror found anything in Robinson's background that mitigated the death penalty.

Further, although Robinson presented extensive evidence of his chaotic childhood, the Court rejected the evidence because it was less compelling than the evidence presented in other Supreme Court cases. *Rompilla v. Beard*, 545 U.S. 374, 391-92 (2005); *Wiggins v. Smith*, 539 U.S. 510, 535 (2003); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000). In doing so, the panel betrayed its "threshold inquiry." In these cases, the Supreme Court addressed the ultimate issue of relief, rather than the more limited inquiry of whether a COA should have been granted.

Finally, the panel erroneously restricted its inquiry to whether reasonable jurists would disagree with the district court's disposition of the case. (*See* Op. at pp. 7, 9; *see also* p. 11 (finding that "Robinson has not shown that the district court erred by denying his motion for a hearing").) The Supreme Court has repeatedly emphasized that grounds for obtaining a COA is not simply whether the district court was correct but also whether the issue is "debatable." *Miller El*, 537 U.S. at

12

336. Given the overwhelming, unrebutted evidence supporting Robinson's IAC claims, the claims were at least debatable.

At a minimum, it was debatable that the district court erred in denying Robinson an evidentiary hearing. First and foremost, the Government *twice* conceded that the district court should conduct an evidentiary hearing. (Resp. at p. 90 (Dkt. 2365); Supp. Resp. at p. 10 (Dkt. 2439).) Given that Robinson's adversary agreed that an evidentiary hearing was appropriate, a jurist of reason would readily conclude that the issues presented are adequate to deserve encouragement to proceed further.

Second, the threshold for obtaining an evidentiary hearing is extremely low. "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court *shall* . . . grant a prompt hearing thereon." 28 U.S.C. § 2255(b) (2010) (emphasis added). Thus, an evidentiary hearing is required where the petitioner presents "independent indicia of the likely merit of [his] allegations." *United States v. Cavitt*, 550 F.3d 430, 442 (5th Cir. 2008). But the panel flipped the standard, compelling Robinson to conclusively refute the Government's aggravating evidence before he would be entitled to a hearing.

For example, the panel gave dispositive weight to Nathan Henderson's testimony to establish that Robinson ordered a "hit" against Michael "One Love"

13

Williams.  (Op. at p. 6 ("none of those declarations rebuts Henderson's testimony concerning Robinson's comments about 'get[ting]' Williams before and after the incident).")  The panel flatly rejected the statements from the alleged perpetrators that they were not acting pursuant to any order from Robinson.  (*See* Exs. 8, 21, 28.)  At the same time, the panel ignored the testimony of Robinson's brother and aunt, who emphatically denied relaying any message to anyone on Robinson's behalf, much less a hit.  (Ex. 62 at ¶ 6; Ex. 64 at ¶ 4.)

In sum, Robinson more than satisfied the minimal COA standard, which is further reduced by the minimal evidentiary hearing standard.  Consequently, because the panel violated *Miller El*, the Court must grant en banc review.

## CONCLUSION

For the foregoing reasons, the Court should grant rehearing en banc to conform the panel's decision to *Miller El*.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

MICHAEL CHARLTON
Deputy Federal Public Defender

DATED: August 6, 2010          By  */s/ Craig A. Harbaugh*
CRAIG A. HARBAUGH
Deputy Federal Public Defender

14

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Pursuant to Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1, I certify that this brief is proportionally spaced, has a typeface of 14 points or more, and is no more than 15 pages.

DATED: August 6, 2010

*/s/ Craig A. Harbaugh*
CRAIG A. HARBAUGH

# CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on August 6, 2010, I electronically filed the foregoing document with the clerk of the court for the U.S. Court of Appeals for the Fifth Circuit, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

SUSAN COWGER
Assistant United States Attorney
U.S. Attorney's Office
1100 Commerce Street, 3rd Fl.
Dallas, Texas 75242-1699

I, the undersigned, hereby certify that on August 6, 2010, I served the foregoing document by mailing a copy to the following individual:

JULIUS OMAR ROBINSON
BOP No. 26190-177
USP - Terre Haute
P.O. Box 33
Terre Haute, Indiana  47808


   /s/ Craig A. Harbaugh
CRAIG A. HARBAUGH

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 8, 2010

No. 09-70020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JULIUS OMAR ROBINSON, also known as Face, also known as Scar, also known as Scarface,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:05-CV-756

Before HIGGINBOTHAM, SMITH, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Julius Robinson, a federal prisoner, was convicted of two murders and conspiring in the death of a third victim. He was sentenced to death. He seeks a certificate of appealability ("COA") to appeal the denial of post-conviction relief under 28 U.S.C. § 2255, alleging that he received ineffective assistance of coun-

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

sel ("IAC") at sentencing and that the district court erred by denying his IAC claim without a hearing. We deny the application.

I.

A.

We described the events leading to Robinson's conviction and sentence in *United States v. Robinson* ("*Robinson I*"), 367 F.3d 278 (5th Cir.), *cert. denied*, 543 U.S. 1005 (2004). In summary, Robinson was a wholesale drug dealer operating in five states. In 1998, he ambushed and killed Johnny Shelton with an assault rifle because Robinson had mistaken Shelton for another man whom Robinson blamed for an earlier hijacking. Several months later, Robinson gunned down and killed Juan Reyes because Reyes was the brother-in-law of another drug dealer who had defrauded Robinson. Robinson was also involved in a broad conspiracy that led to the murder of a third man, Rudolfo Resendez.

B.

For these murders and his complicity in an ongoing criminal enterprise, Robinson was convicted and sentenced to death on three separate counts, to life imprisonment on two others, and to a consecutive 300-month sentence on another. *Robinson I*, 367 F.3d at 282. During the sentencing phase, the prosecution presented evidence of Robinson's likely future dangerousness, referring to his membership in a gang and two additional incidents from his past. Sarah Tucker, Robinson's former high school classmate, testified that he had once fired several shots into her truck and her grandparents' apartment while she sat parked in the driveway, because she owed him $120 for crack cocaine. Robinson was convicted of deadly conduct in Texas state court for that episode.

The prosecution also presented evidence that, while in prison awaiting trial for murder, Robinson ordered a hit on the life of Michael "One Love" Willi-

ams, who was from Robinson's hometown of Dermott, Arkansas, and who had testified against Robinson before the grand jury. According to one of Robinson's co-defendants, Nathan Henderson, Robinson said he hoped someone would "get" Williams. At one point, Robinson participated in a three-way phone call with his brother and aunt during which he said, "That dude One Love, man that dude right there go hard, Joe." Williams (i.e., One Love) testified at trial that he was accosted in Dermott by three young men who told him they would kill him for snitching on their leader in Texas. Williams eventually escaped from the three men. Robinson later told Henderson that the "youngsters" in Dermott "got" One Love.

The defense called numerous witnesses. Several of Robinson's former coaches and one former teammate testified that Robinson was polite, well-liked, and responsible. An employee at the computer training school where Robinson took classes testified to his good attendance and successful course work. The defense also called several witnesses from the facility where Robinson was incarcerated before trial. They testified that he was a quiet, courteous, and well-behaved inmate. On cross-examination, one of the witnesses admitted that Robinson had broken a rule by participating in a three-way telephone call.

Two members of Robinson's family testified. John Hollimon, Jr., his uncle, said that Robinson had been raised by his grandparents in Dermott when he was young and that that environment, though poor, was a loving one. When Robinson and his brother grew older, his mother, Rose Hollimon, brought the boys to Arlington, Texas, to live with her. There, according to John Holimon, Robinson lived in a dangerous environment and was forced to fend for himself. Holimon also said that Robinson had supported his grandparents in the past and was excited about his computer course.

Rose Holimon then described how she had married Robinson's father when she was fifteen years old and that her husband abandoned her several years

No. 09-70020

later.  She left her sons with their grandparents, believing it would be the best thing for them.  She admitted abusing alcohol and drugs while her sons lived with her in Arkansas.  She also described Robinson as an average student.

The government and defense called witnesses to testify as to the likelihood of prison violence.  The defense witness testified that there was a 20-30% chance that a capital inmate like Robinson would be involved in serious prison violence and a 1% chance such an inmate would commit murder in prison.  The government witness opined that the main predictors of prison violence were young age and past violence.  He also noted that Robinson was likely to be housed in a facility where he would interact often with other inmates and have telephone access.

## C.

Robinson unsuccessfully moved for post-conviction relief under § 2255, then filed an application for COA in the district court on two questions: whether he received IAC at the sentencing phase and whether the district court was required to hold an evidentiary hearing on that issue.  The district court denied the application, and Robinson petitions this court for a COA on the same two issues.

## II.

A petitioner must obtain a COA as a "jurisdictional prerequisite" to appealing the denial of relief under § 2255.  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004).  Where the district court has rejected a petitioner's constitutional claims on the merits, he must show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encour-

agement to proceed further." *Miller-El*, 537 U.S. at 327 (citation omitted). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that the petitioner will not prevail." *Id.* at 338. In our COA determination, we conduct a "threshold inquiry" consisting of "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* at 336. In a death penalty case, we resolve any doubt about whether a COA should issue in favor of the petitioner. *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005).

## A.

Robinson presents two bases for his IAC claim. First, he alleges that his trial counsel did not adequately investigate and rebut the prosecution's evidence regarding future dangerousness—Robinson's alleged gang involvement, the shooting of Tucker's truck, and the purported hit order on Williams. Second, Robinson claims his trial counsel did not adequately investigate his life history, which would have uncovered additional mitigating evidence.

Reviewing a COA petition, we do not decide the merits of Robinson's IAC claims; indeed, we lack jurisdiction to do so. *Miller-El*, 537 U.S. at 336-37. That said, our threshold inquiry of the merits necessarily involves consideration of the elements of the underlying claim for which a COA is requested. *Miller v. Dretke*, 404 F.3d 908, 916 (5th Cir. 2005). To prove IAC, Robinson must show that (1) counsel's performance was deficient, that is, below an objective standard of reasonableness; and (2) the deficient performance prejudiced his defense, that is, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Id.* at 916-17 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984)). Under *Washington*'s first prong, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Washington*, 466

U.S. at 689.  Under the second prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  If a court concludes that "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed" without analyzing the objective reasonableness of counsel's performance. *Id.* at 697.

We first address Robinson's contention that sentencing counsel failed adequately to investigate and rebut evidence of future dangerousness.  With regard to the alleged hit order from prison, Robinson now produces declarations of those involved in accosting Williams, and Williams himself, denying that the three young men were acting under Robinson's orders.  Robinson also claims his words "that dude [Williams] right there go hard" were not an instruction to kill Williams, but rather a comment that Williams would do or say anything.  On the other hand, none of those declarations rebuts Henderson's testimony concerning Robinson's comments about "get[ting]" Williams before and after the incident, and, as the district court observed, the declarations themselves are contradictory in some respects.

As for the shooting of Tucker's truck, Robinson proffers evidence that he did not know Tucker was in the vehicle.  Robinson's companion during the shooting now claims, in contradiction to the earlier testimony that he and Robinson were elsewhere during the shooting, that neither of them saw Tucker inside the truck.  According to Robinson, that evidence suggests he was not attempting to murder Sarah Tucker but rather was spraying bullets into her truck and grandparents' apartment "in frustration."  Robinson's § 2255 counsel also interviewed Robinson's defense counsel for the deadly conduct prosecution, who avers that Robinson's plea to a third-degree felony and a relatively light sentence––five years of probation and deferred adjudication––confirms the "minor nature" of the crime.

6

No. 09-70020

Robinson also claims that his trial counsel should have suppressed any evidence of his affiliation with the Dermott Crips gang under *Dawson v. Delaware*, 503 U.S. 159, 165-67 (1992). *Dawson* held that a stipulation to the defendant's membership in the Aryan Brotherhood prison gang was irrelevant to his sentencing and led to constitutional error, because the only information presented about the gang was its racist beliefs. *Id*. at 162, 165. But had the prosecution given some other justification for referring to the gang, such as a reputation for violence, it would have presented "a much different case." *Id*. at 165. That was precisely the reason for linking Robinson to the Dermott Crips, so references to the gang were relevant.

Alternatively, Robinson argues his lawyers should have interviewed the police chief or consulted an expert to testify that the Dermott Crips were "nothing more than a group of adolescent hoodlums" rather than a "fearsome gang." But in his own brief, Robinson cites trial testimony from Terence Holimon that already presented a similar view to the jury.

After a threshold inquiry into Robinson's complaints that his trial counsel failed adequately to investigate and rebut evidence of future dangerousness, we conclude that no reasonable jurist would find that Robinson was prejudiced by the above alleged deficiencies. Even if Robinson had been able to introduce all of his newfound rebuttal evidence, the jury would have been left with plausible evidence that Robinson ordered a hit from prison; his open admission that he fired shots into a car and apartment in anger over a $120 debt; and nothing new about the Dermott Crips.

And most importantly, Robinson's two brutal murders and complicity in a third would have remained in the fore. Though the future dangerousness evidence was a significant element in the verdict, *see Robinson I*, 367 F.3d at 283, no jurist of reason would believe that the dent in that evidence, which Robinson alleges, would have created a reasonable probability of a different verdict.

No. 09-70020

B.

Robinson claims he received IAC because his trial counsel failed adequately to investigate and present mitigating evidence about a rocky upbringing and childhood exposure to brain-damaging substances. We consider these claims in turn.

Robinson proffers new witness statements to show that his childhood was less structured and rougher than was indicated by John Holimon's and Rose Holimon's testimony at trial. Some of the new evidence is cumulative of what the jury heard: Rose's drug abuse, her decision to abandon Robinson to his grandparents, his grandfather's blindness, and Robinson's dangerous years as a teenager in Arlington. Some of the information is new: allegations of physical fighting between Robinson's parents (some, however, before Robinson's birth); the alleged beating Robinson suffered as part of his initiation into the Dermott Crips "pseudo-gang;"[1] the allegation that Robinson was abusing alcohol by the time he reached middle school; and a brief, uncorroborated suggestion by his father that a neighbor sexually touched Robinson when he was five years old.

Robinson also offers new evidence that brain damage caused by exposure to alcohol in the womb and to pesticides as a young child mitigates his culpability. That evidence is scant on specifics. He claims, for instance, that the effects of *in utero* alcohol exposure were apparent at his birth, but the only physical evidence he offers is that his birth weight was five pounds, six ounces. He also claims that his grandparents' home in Dermott was "very near" a farm that was crop-dusted regularly with pesticides. He suggests that as a result he was likely exposed to two common, highly-toxic pesticides used to control *mosquitoes* in Arkansas, repeated exposure to which can cause cognitive and emotional difficul-

---

[1] Robinson is careful not to acknowledge the Dermott Crips as an actual gang, perhaps because, to rebut future dangerousness evidence, he also insists that they were "nothing more than a group of adolescent hoodlums."

No. 09-70020

ties.

Robinson insists that his early difficulties in school and his struggle to obtain a C-minus grade point average by the time he graduated high school are direct evidence of fetal alcohol and childhood pesticide exposure. He also offers the statement of a neuropsychologist that Robinson exhibits "subtle cognitive deficits" that are "consistent with"––but not indicative of––exposure to the two pesticides.

Any reasonable jurist would agree with the district court's holding that neither strand of Robinson's new mitigation evidence shows IAC. With respect to the new evidence of a difficult childhood in Dermott, Robinson has not made a substantial showing that the omission of that evidence was prejudicial. Robinson's case for a difficult childhood's mitigating his culpability is far less compelling than the showing in recent cases in which the Supreme Court found the omission of mitigation evidence prejudicial.[2]

As for Robinson's claim that childhood brain damage reduces his culpability, the supporting evidence is, even under the most generous interpretation, exceedingly thin. No reasonable jurist would find its omission prejudicial. Because Robinson has not shown that reasonable jurists could disagree with the district court's denial of his IAC claims, we deny his application for a COA on those grounds.

---

[2] *See Rompilla v. Beard*, 545 U.S. 374, 391-92 (2005) (Rompilla was repeatedly beaten by his father, was locked with his brother in an excrement-filled dog pen, and grew up without proper clothing or indoor plumbing); *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (Wiggins's alcoholic mother left him alone with his siblings for extended periods to beg for food or eat paint chips, his mother beat him when he broke into the kitchen to get food, he was hospitalized when his mother pressed his hand to a stove burner, and he was repeatedly raped and sexually abused in foster care and a Jobs Corps program); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (Williams was repeatedly and severely beaten by his father, his parents were imprisoned for criminal neglect, he was abused in foster care, and he was borderline mentally retarded).

### III.

Robinson claims that the district court erred by disposing of his § 2255 motion without a hearing. The court should hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). The court denied a hearing because it had "decided [his] claims either by assuming that everything Robinson alleges is true or based on legal, not factual bases."

We review the denial of an evidentiary hearing in a § 2255 proceeding for abuse of discretion. *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992). To prove abuse of discretion, a petitioner must "produce independent indicia of the likely merit of [his] allegations." *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006). Contested factual issues may not be decided on the basis of affidavits alone unless the affidavits are supported by other evidence in the record. *United States v. Hughes*, 635 F.2d 449, 451 (5th Cir. Unit B Jan. 1981).

Robinson's chief complaint is that the court accepted as fact, without corroboration in the record, his trial counsel's assertion that they had strategic reasons for not presenting evidence about the Dermott Crips. Even if we assume *arguendo* that this was an improper factual determination outside of a hearing, it was harmless. The court relied on the "strategic reasons" of trial counsel at two points in its decision: in finding counsel were not ineffective for failing to *rebut* evidence about the dangerousness of the gang, and (ironically) in finding counsel were not ineffective for failing to *present* evidence about the gang's dangerous impact on Robinson's upbringing. Both of those conclusions were also supported by alternative grounds, including other evidence that counsel had not been deficient, and also––regardless of counsel's adequacy or lack thereof––the finding that any hypothetical deficiency was not prejudicial.

Robinson points to three other places in the court's opinion that, he claims, amount to improper factual determinations: (1) the court's comment that the

10

No. 09-70020

declaration of Robinson's companion during the Tucker shooting was of questionable credibility, because it contradicted his previous sworn testimony; (2) the court's agreement with the government that pleas to lesser charges, like Robinson's plea in the Tucker shooting, are common and do not necessarily indicate that the factual basis of an original greater offense is incorrect; and (3) the court's faulting of Robinson for failing to support with useful documentation his assertion that trial counsel spent inadequate time meeting with him.

The first two supposed "fact-findings" are uncontroversial and uncontroverted statements of the obvious. The third is not a fact-finding at all, nor is it, as Robinson alleges, an unfair denial of the opportunity to prove that his attorneys inadequately prepared; if Robinson wanted to support his contentions with additional documentation, he was free to do so. Because Robinson has not shown that the district court erred by denying his motion for a hearing, we deny his petition for a COA on that ground.

The application for a COA is DENIED.

11

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

June 08, 2010

Ms. Karen S. Mitchell
Northern District of Texas, Fort Worth
United States District Court
501 W. 10th Street
Room 310
Fort Worth, TX 76102

     No. 09-70020,  USA v. Julius Robinson
         USDC No. 4:05-CV-756
         USDC No. 4:00-CR-260-2

Dear Ms. Mitchell:

Enclosed is a copy of an opinion-order entered on 06/08/2010.  We have closed the case in this court.

We will forward the record on appeal at a later date.

Sincerely,

LYLE W. CAYCE, Clerk

By: _James R. Cheramie_
James R. Cheramie, Deputy Clerk

Enclosures

cc:
    Mr. Michael B Charlton
    Ms. Susan Cowger
    Mr. Craig Anthony Harbaugh
    Mr. Sean Kevin Kennedy
    Honorable Terry R. Means